798 A.2d 5

James Herbert NERO

v.

STATE of Maryland.

No. 1431, Sept. Term, 2001.

Court of Special Appeals of Maryland.

May 7, 2002.

334

George E. Burns, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Steven L. Holcomb, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Douglas Gansler, State's Attorney for Montgomery County of Rockville, on the brief), for appellee.

Submitted Before SALMON, JAMES R., EYLER, and SHARER, JJ.

JAMES R. EYLER, Judge.

Appellant, James Herbert Nero, was charged with armed robbery and related offenses. He was tried with a co-defendant, Robert Milton Shuebrooks, by a jury in the Circuit Court for Montgomery County. Appellant was found guilty of two counts of armed robbery, four counts of first degree assault, four counts of use of a handgun in the commission of a

felony or crime of violence, two counts of reckless endangerment, and one count of conspiracy to commit robbery. Appellant was sentenced to a total of one hundred years' imprisonment. This appeal followed.

Appellant presents the following issues for our consideration:

I. Whether the trial court erred in denying appellant's motion to suppress;

II. Whether the trial court erred in permitting a police officer to testify as to her opinion that some of the witnesses were certain of their photographic identifications of appellant and his co-defendant;

III. Whether the trial court erred in not admitting exculpatory evidence;

IV. Whether the trial court erred in denying appellant's motion for new trial; and,

V. Whether the trial court committed plain error in its jury instructions.

## FACTUAL BACKGROUND

At about midday on May 1, 1999, Robert White was working at the Finlay Fine Jewelry counter at a Hecht's department store in Chevy Chase. Sandy Jones, a manager, was also working there that day.

White testified at trial that as he was assisting a customer, Caroline Neuman, he noticed an African American male whom he described as "maybe six feet" tall, with a "short hair cut," and a "kind of long face." The man was dressed in a "blue nylon, like a blue jacket, jeans maybe." About five minutes after White first noticed the man, he saw another man grab Neuman and put a gun on the counter. The second man told White to start filling a bag with jewelry. White described the second man as being "around five 10 and a half or so" in height. White noticed that the man wore a blazer and pants and that the zipper on his pants was open and his shirt was "hanging through the zipper." The man also wore "a wig like

dreadlocks or something like that and [a] Ca[r]go hat with a little flip button [on] the front." White testified that the man had a scar on his eyebrow.

White filled the bag with jewelry. White then noticed that Jones was also filling a bag with jewelry and that the man he first noticed in the store was telling Jones what to put in the bag and to hurry up. When Jones was finished filling the bag with jewelry, the first man took the bag from Jones and the two men left the store together.

White testified that he "stood there for a second and [ ] was still kind of in shock." He then "ran and got a piece of paper and a pen and ran after the guys outside, I wanted to try to get their tag number or see which way they were going at least." White testified that a Hecht's security guard, Hurist Morgan, also ran after the two men as they left the store.

White and Morgan exited the Hecht's department store onto Wisconsin Avenue and ran up a hill. According to White,

when we got to about mid-way at the top of the hill, I saw [the two men] get into a white Jeep Cherokee so I started writing down the tag number and the guy—guy with the gun, as he was opening the door, he looked up and saw us, you know, coming down the hill and the door hit his hand that was holding the bag of jewelry which that dropped it on the ground, I guess he got mad and he pulled out the gun and he fired some shots at us and we dove into the bushes.

White was able to crawl through the bushes and see the tag number of the Jeep Cherokee, which he wrote down and later gave to the police.

At trial, White identified appellant and his co-defendant, Shuebrooks, as the men who were involved in the robbery at the Hecht's department store on May 1, 1999.

Jones testified at trial that, about ten minutes before the robbery took place, she noticed the shorter of the two defendants, later identified as Shuebrooks, looking at some watches while she was showing a lady some earrings. Jones stated that the man she noticed, Shuebrooks, was African American,

had long dreadlocks, and wore dark glasses and a suit jacket. While looking in a drawer for a gift box for a customer, Jones saw a man flip a bag over the counter. The man said "take this." Initially, Jones thought the man wanted her to dispose of the bag in the trash, so she took the bag and started to walk off with it. The man then flipped another bag over the counter, told White to fill it up, and showed Jones a gun.

Jones eased over to the cash register, laid down her keys, and knocked the telephone off the hook. Shuebrooks told Jones to be quiet and go back over to where she was and to fill the bag with jewelry. He said that he wanted the diamonds out of the jewelry case. Jones told him that she had to go back to the register to get her keys, and while she was at the register, she used the telephone to dial the number for security. She then returned to the jewelry case, opened it, and started putting the diamonds in the bag. As she was filling the bag, Shuebrooks reached over the counter and grabbed the bag out of her hand. Shuebrooks and appellant then turned and started walking away. Jones witnessed White and the security guard chase after Shuebrooks and appellant. She then dialed 911.

Officer Richard Grapes of the Montgomery County Police Department testified that, around noon on May 1, 1999, he received a call for "an armed robbery in progress where shots were fired." Officer Grapes received information that the suspects were in a Jeep that had left the loading dock area of the department store and was traveling on Friendship Avenue. Officer Grapes found a wig and sunglasses on Friendship Avenue. He roped off the area and secured the evidence.

David McGill, a forensic services technician for the Montgomery County Police Department, was responsible for documenting the crime scene and collecting and preserving the evidence for future analysis. He recovered the wig and sunglasses found by Officer Grapes. He also collected three shell casings from the parking lot, assorted items of jewelry, and some fingerprints.

Montgomery County Police Detective Nancy Bond testified that she investigated the May 1, 1999 robbery at the Hecht's department store. She also investigated a March 5, 1999 robbery of a Lord and Taylor's department store. Detective Bond stated that she obtained surveillance photographs that contained excellent pictures of the suspects of the Lord and Taylor's robbery. A few days after the May 1, 1999 robbery at Hecht's, Detective Bond showed the surveillance photographs of the suspects of the Lord and Taylor's robbery to both White and Jones. At the suppression hearing, Detective Bond testified that there were a total of 9 surveillance photographs, but she could not recall which photographs she showed to White and which photographs she showed to Jones. According to Bond, both White and Jones identified one of the suspects in the photographs as the individual who had had the gun in the Hecht's robbery. At that time, Detective Bond did not know the name of the suspect in the surveillance photographs. Her purpose in showing the surveillance photographs to White and Jones was to determine if the same suspect was involved in both the Lord and Taylor's and the Hecht's robberies.

Detective Bond further testified that during the course of her investigation, she read a newspaper article about another robbery that had occurred at the Uptown Movie Theater in the District of Columbia. Detective Bond believed that the District of Columbia robbery may have been related to the May 1, 1999 robbery at the Hecht's store. Detective Bond contacted an officer at the Metropolitan Police Department in the District of Columbia and arranged to be present when a search of appellant's home in the District of Columbia was conducted, pursuant to a search warrant obtained by the Metropolitan Police Department in connection with their investigation of the theater robbery.

Detective Dave Edelstein of the Metropolitan Police Department testified that on June 23, 1999, he and .other officers executed a search warrant for an apartment located at 723 Longfellow Street in Washington, D.C. Detective Bond was present for the search. During the search of the apartment,

officers found papers and photographs connecting appellant to the apartment. They also found jewelry, a jewelry tag, and pawn receipts in the apartment, which were seized and subsequently turned over to the Montgomery County Police Department.

After receiving the pawn receipts and jewelry, Detective Bond put a stop on certain jewelry at area pawn shops and, eventually, identified certain items of jewelry as having been taken from the Finlay Fine Jewelry counter at the Hecht's department store on May 1, 1999.

Detective Bond prepared two photographic arrays, one of which included appellant's photograph and one of which included Shuebrooks' photograph.[1] Detective Bond testified that both White and Jones identified the photographs of appellant and Shuebrooks as the men who perpetrated the robbery.

At trial, it was stipulated that appellant was in actual possession of a 9 millimeter handgun that was recovered by the Metropolitan Police Department on June 22, 1999, and admitted in evidence. An expert witness testified that the casings found on the Hecht's parking lot had been fired from that gun. It was also stipulated, *inter alia,* that appellant and Shuebrooks "lived in the same residential complex from 1993 to 1994."

We shall include additional facts as necessary in our discussion of the issues presented.

## DISCUSSION

### I.

Appellant contends that the trial court erred in denying his motion to suppress evidence. Our review of the trial

---

1. Detective Bond testified that during the course of another investigation, she obtained information from a detective in St. Mary's County that Shuebrooks was possibly involved with appellant in one of the jewelry store robberies.

court's denial of appellant's motion to suppress is based solely on the record of the suppression hearing, and we do not consider the trial record. *Rowe v. State,* 363 Md. 424, 431, 769 A.2d 879 (2001); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000). In *Brown v. State,* 124 Md.App. 183, 720 A.2d 1270 (1998), *cert. denied,* 353 Md. 269, 725 A.2d 1067 (1999), we set forth the standard for review of the denial of a motion to suppress as follows:

In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing, extend deference to the fact finding of the suppression judge, and accept those findings as to disputed issues of fact unless clearly erroneous. See *Jones v. State,* 343 Md. 448, 457–58, 682 A.2d 248 (1996); *Pryor v. State,* 122 Md.App. 671, 677 n. 4, 716 A.2d 338 (1998); *Partee v. State,* 121 Md.App. 237, 244, 708 A.2d 1113 (1998). We also consider those facts that are most favorable to the State as the prevailing party on the motion. *Jones,* 343 Md. at 458, 682 A.2d 248; *Partee,* 121 Md.App. at 244, 708 A.2d 1113. We make our own independent constitutional appraisal based on a review of the law as it applies to the facts of the case. *Jones,* 343 Md. at 457, 682 A.2d 248.

*Brown,* 124 Md.App. at 187–88, 720 A.2d 1270.

At the suppression hearing, Detective Edelstein of the Metropolitan Police Department testified that he obtained two search warrants, one for appellant's house and another for appellant's Jeep. When asked to describe the investigation that led up to getting the warrants, Detective Edelstein testified as follows:

On June 22, 1999 there was an armed robbery at the Uptown Theater that's located at 3426 Connecticut Avenue in Northwest, D.C. After the subject committed the robbery, he was chased by several employees and fired a handgun at them striking one of them in the foot and made good his escape into a Jeep Wrangler. A tag number was obtained by witnesses. We subsequently ran that tag number and got a listing of the vehicle and an address to go along with it.

The vehicle was identified as belonging to appellant and was listed at 723 Longfellow Street in Washington, D.C. According to Detective Edelstein, police units were dispatched to the Longfellow Street address. Officers saw a Jeep that matched the description of appellant's being driven in the area. A vehicle pursuit ensued. During the chase, appellant, while driving the Jeep, fired a handgun at a marked police cruiser. The chase culminated when appellant crashed the Jeep into other vehicles and was apprehended by the police.

The search warrant obtained by Detective Edelstein for the Longfellow Street apartment authorized the seizure of "clothing, ammunition, firearms, and any other items believed to be evidence of a crime, personal papers showing residence, vehicle ownership or gun registration/ ownership." There was nothing in the affidavit used to obtain the search warrant that specifically mentioned jewelry store robberies or discussions with Detective Bond of the Montgomery County Police Department about the May 1, 1999 robbery at the Hecht's department store.

Both Detective Edelstein and Detective Bond were present, along with other officers, when the search of the Longfellow Street apartment was conducted. Among the items seized from the apartment were pawn receipts and jewelry. Some of the pawn receipts were for jewelry pawned by appellant's girlfriend, Candice Lee, and others were for jewelry pawned by appellant. According to Detective Edelstein, the pawn receipts showed appellant's residence because they listed the Longfellow Street apartment as his address.

At the suppression hearing, appellant argued that the language in the search warrant authorizing seizure of "any other items believed to be evidence of a crime" was overly broad in that it allowed seizure of evidence of other crimes. He also argued that there was bad faith on the part of Detective Edelstein in failing to disclose to the judge who signed the search warrant "that there was this ancillary investigation going on [and] that the police officer was going to use [the warrant] to bring somebody else in and investigate another

crime...." In addition, appellant argued that the language used in the search warrant was overly broad, and that there was no nexus between the items listed in the warrant and the items seized.

The trial judge denied the motion to suppress, stating as follows:

All right. The question is whether or not the evidence seized in the execution of the search warrant on June 23, 1999 should be suppressed. The Detective Edelstein who obtained the search warrant has testified concerning the circumstances surrounding his obtaining of the search warrant, the affidavit, and support of an application for search warrant has been submitted along with the search warrant.

The affidavit on its face contains probable cause for the issuance of the search warrant, the search warrant was properly issued. The question is whether or not the Detective engaged in bad faith in the obtaining of this search warrant by failing to disclose information that he had in the application which then resulted in the seizure of additional items that were not contemplated by the search warrant.

The search warrant application states in the last paragraph that "it is requested that a Superior Court search warrant be issued for the entire premises for the seizure of all evidence and proceeds of criminal activities as well as any contraband discovery."

There is no limitation within the application or the search warrant itself as to who is to be present for the execution of the search warrant, there is nothing illegal or unlawful about the presence of Montgomery County police detectives during the course of the execution of the search warrant.

I do not find that the affidavit by Detective Edelstein and the information that he had in his possession at the time that he obtained the search warrant constituted bad faith. There was ample probable cause based upon the information that he had, there is nothing that is incorrect or improper about the information that was presented to the judge, and it's clear to me that the evidence that was seized

did constitute evidence and proceeds of criminal activities as authorized under the scope of the search warrant as issued. Accordingly, I deny the motion to suppress.

On appeal, appellant does not pursue his "bad faith" argument. He contends that the trial court erred in denying his motion to suppress because the warrant authorizing officers to search for "any other evidence relating to the commission of a crime" was not sufficiently particular with respect to the things to be seized and the warrant was, therefore, rendered fatally general in nature. He further contends that, although excessively broad language in a warrant may be limited by reference to the attached affidavit, there was nothing in the supporting affidavit submitted by Detective Edelstein to provide a basis for seizing the pawn receipts and the jewelry.

The Fourth Amendment to the Constitution of the United States, in furtherance of the expressed right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, provides that " . . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment is made applicable to the states by the Fourteenth Amendment.[2]

"General warrants, of course, are prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). As the United States Supreme Court explained in *Andresen*,

"[T]he problem [posed by the general warrant] is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. . . . [The Fourth Amendment ad-

---

**2.** Article 26 of the Declaration of Rights to the Constitution of Maryland prohibits general search warrants but does not contain an express requirement that a warrant particularly describe the items to be seized. It provides, in relevant part, that "all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

dresses the problem] by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). This requirement " 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), quoting *Marron v. United States,* 275 U.S. [192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927) ].

*Andresen,* 427 U.S. at 480, 96 S.Ct. 2737. In *Andresen,* the Supreme Court agreed with the earlier determination by our court that the phrase "together with other fruits, instrumentalities and evidence of crime" did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence relevant to the crime of false pretenses and a specific tract of real property that were at issue in that case. *Id.* See also *United States v. Hoang Anh Thi Duong,* 156 F.Supp.2d 564, 571–72 (E.D.Va.2001)(excessively broad language in a warrant may be limited by reference to the attached affidavit).

In the instant case, the phrase "any other items believed to be evidence of a crime" that was contained in the search warrant, along with a list of particular items, authorized the executing officers to conduct a search for and seize evidence relevant to the robbery of the Uptown Theater in Washington, D.C. as described in the affidavit made by Detective Edelstein in support of his application for the search warrant.

 Of course, the items officers may reasonably seize under a constitutionally valid warrant and search pursuant thereto are not confined to those specifically designated in the warrant if a nexus exists between the item to be seized and criminal behavior. *Gerstein v. State,* 10 Md.App. 322, 332, 270 A.2d 331 (1970); *Crawford v. State,* 9 Md.App. 624, 627, 267 A.2d 317 (1970)(citing *Anglin v. State,* 1 Md.App. 85, 88–90, 227 A.2d 364, and cases cited therein). Such a nexus is automatically provided in the case of fruits and instrumentali-

ties of crime and contraband. *Crawford,* 9 Md.App. at 627, 267 A.2d 317.

In *Crawford v. State,* a search warrant was issued upon an affidavit showing probable cause that narcotic drugs and narcotic paraphernalia were being concealed in the subject premises. While executing the search warrant, the officers found narcotic paraphernalia and about 29 pawn tickets in a bedroom closet. One of the pawn tickets was for a radio that had been stolen in a breaking and entering, and it was this radio that Crawford was convicted of receiving. In finding that the seizure of the pawn tickets was reasonable and that the trial court did not err in admitting them, we explained:

> The pawn ticket for the radio was relevant and material to the charges in indictment 2156 as tending to establish that appellant had possession of goods stolen in the breaking. It was properly admissible if legally obtained by the police. It was legally obtained if its seizure was reasonable. Its seizure was reasonable if made after fulfilling the probable cause and particularity requirements of the Fourth Amendment. "Mere evidence" may be so seized as well as fruits, instrumentalities, and contraband. *Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 18 L.Ed.2d 782. "There must, of course, be a nexus-automatically provided in the case of fruits, instrumentalities or contraband-between the item to be seized and criminal behavior." *Id.,* at 307, 87 S.Ct. 1642. If this nexus exists, the items the police may reasonably seize under a constitutionally valid warrant and search are not confined to those specifically designated in the warrant. *Anglin v. State,* 1 Md.App. 85, 88–90, 227 A.2d 364, and cases therein cited. We think that here the police had reason to believe that there was a nexus between the 29 pawn tickets and criminal behavior. The large number of pawn tickets, come by on a valid search, showed that it was necessary that appellant frequently required cash and it was probable, in the light of the narcotic paraphernalia found in his possession by a legal search, that the cash was used to

buy narcotic drugs, the possession and control of which are ordinarily unlawful.

*Crawford*, 9 Md.App. at 627–28, 267 A.2d 317.

In *State v. Wilson*, 279 Md. 189, 367 A.2d 1223 (1977), the Court of Appeals considered whether the search for and seizure of certain serial numbers were lawful. As in *Crawford*, the warrant that was issued in the *Wilson* case mentioned only narcotics and narcotics paraphernalia. *Wilson*, 279 Md. at 194, 367 A.2d 1223. During the course of the search, officers observed various electronic items including televisions, stereo equipment, and cameras. One of the officers wrote down the serial numbers of all of the items and later checked them against those stored in a national computer system that lists serial numbers of stolen equipment. One number matched, indicating that Wilson possessed a cassette tape recorder that had been stolen. The officer then referred the matter to another division of the police department.

Subsequently, officers returned to Wilson's residence and were invited inside by one of Wilson's housemates. One officer approached Wilson, advised him of his Miranda rights, and explained that stolen property had been observed in his home. The cassette tape recorder was seized and Wilson was arrested and charged with a number of crimes including burglary and receiving stolen property.

At trial, Wilson objected to the introduction of the cassette tape recorder. The trial court ruled that Wilson had consented to the seizure of the cassette tape recorder and, therefore, found that it was not necessary to rule on the legality of the seizure of the serial numbers.

On appeal, we reversed. In affirming our decision, the Court of Appeals wrote as follows:

> The issue in controversy here is whether the search for the serial numbers and their seizure were lawful. To prevent the issuance of general warrants, the Fourth Amendment requires that a warrant 'particularly [describe] the place to be searched, and the persons or things to be seized.' The warrant which was issued here mentioned only

narcotics and narcotics paraphernalia. Manifestly, then, the seizure of the serial numbers cannot be justified under the terms of the warrant.

Moreover, 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' To sustain the seizure here, therefore, the State must shoulder the heavy burden of showing that one of the exceptions applies.

*Wilson*, 279 Md. at 194, 367 A.2d 1223 (citations omitted).

In *Wilson*, the State argued that the seizure of the serial numbers was valid under the "plain view" doctrine enunciated in *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The Court of Appeals rejected that argument because it was not immediately apparent to the police that they had evidence before them. The Court of Appeals explained that the police must have probable cause to believe the evidence is incriminating before they seize it. *Wilson*, 279 Md. at 195, 367 A.2d 1223. Quoting from *United States v. Gray*, 484 F.2d 352, 356 (6th Cir.1973), the Court of Appeals wrote:

'[I]t must be 'immediately apparent' to the police that the object is in fact incriminating or the seizure of the object would be without probable cause and would turn the search into a general or exploratory one.' Stated another way, to be subject to seizure, the object must be one for which the police could have obtained a warrant because they had probable cause.

*Wilson*, 279 Md. at 195, 367 A.2d 1223 (citations omitted).

The Court of Appeals went on to discuss what information a police officer must possess before he or she can be said to have probable cause to seize evidence:

In the context of another exception to the warrant requirement, the 'hot pursuit' doctrine, the Supreme Court has indicated what information a police officer must possess

before he can be said to have probable cause to seize evidence:

'... There must, of course, be a *nexus*—automatically provided in the case of fruits, instrumentalities or contraband—*between the item to be seized and criminal behavior.* Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.'

This standard has also been used to determine whether probable cause existed to seize articles in plain view.

In [*Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)], of course, the Court held that mere evidence, as well as fruits, instrumentalities, and contraband, may be seized under certain circumstances. Under the *Hayden* formulation, as long as police have probable cause to believe that what they see is contraband, or the fruit or instrumentality of some unspecified criminal activity, they may seize the object. Where, however, they possess probable cause to believe that the object is mere evidence, officers may seize it as an aid in a particular apprehension or conviction. These standards furnish guidelines to determine the ultimate issue, whether an officer of reasonable caution would be warranted in believing that an offense is being or has been committed and that the object is evidence incriminating the accused.

Whether we regard the cassette recorder as the "fruit of crime" or "mere evidence," the record fails to support the State's contention that the officer possessed probable cause to seize the serial numbers. In support of its claim, the State first urges that since drug users frequently deal in stolen goods to support their habit, the officer possessed probable cause to believe the equipment was stolen. This 'nexus,' standing alone, is too remote in this case to establish probable cause. The cases upon which the State relies are all distinguishable. In each instance, either the same or a similar kind of criminal conduct was involved.

\* \* \*

The State also argues that the large quantity of equipment observed in appellee's bedroom created probable cause. In our view, however, the record justifies no more than a mere suspicion that any of the goods were stolen. *Wilson,* 279 Md. at 195–98, 367 A.2d 1223.

■ In the case *sub judice,* no exception to the warrant requirement is applicable. We reject the State's contention that the good faith exception is applicable because the officers were directed to seize "any other items believed to be evidence of a crime."

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court first announced the good faith exception. This exception modifies the Fourth Amendment exclusionary rule by providing for the admissibility of evidence seized under a warrant subsequently determined to be invalid if the executing officers acted in objective good faith and with reasonable reliance on a facially valid warrant. *Leon,* 468 U.S. at 919–20, 104 S.Ct. 3405; *McDonald v. State,* 347 Md. 452, 467–68, 701 A.2d 675 (1997); *Connelly v. State,* 322 Md. 719, 729, 589 A.2d 958 (1991). The test under *Leon* is not whether there was probable cause, but whether a reasonably well trained officer would have known the search was illegal, despite the authorization from the judge. *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. 3405; *McDonald,* 347 Md. at 469, 701 A.2d 675; *Minor v. State,* 334 Md. 707, 717, 641 A.2d 214 (1994).

In *Braxton v. State,* 123 Md.App. 599, 720 A.2d 27 (1998), Judge Hollander, writing for this Court, set forth a detailed discussion of the good faith exception stating, in part, as follows:

Notwithstanding the importance of the exclusionary rule to the Fourth Amendment jurisprudence, the Supreme Court determined that 'suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.' *Leon,* 468 U.S. at 918, 104 S.Ct. 3405; *McDonald,* 347 Md. at 468, 701

A.2d 675. In [*Massachusetts v. Sheppard*, 468 U.S. 981, 989–90, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) ], the Court added: 'We refuse to rule that an officer is required to disbelieve a judge who has just advised him ... that the warrant he possesses authorizes him to conduct the search he has requested.'

To be sure, *Leon* made clear that there are circumstances when exclusion of evidence remains the appropriate sanction, even if an officer 'has obtained a warrant and abided by its terms.' *Leon,* 468 U.S. at 922, 104 S.Ct. 3405. This is because 'the officer's reliance on the magistrate's probable-cause determination ... must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.' 468 U.S. at 922–23, 104 S.Ct. 3405 (citations and footnotes omitted).

*Braxton,* 123 Md.App. at 634–35, 720 A.2d 27. *See also Connelly,* 322 Md. at ·728–29, 589 A.2d 958 (the good faith exception permits an officer generally to rely upon a warrant, but this reliance must be objectively reasonable).

Detective Bond testified at the suppression hearing that when she became aware that a warrant was to be executed at appellant's home in the District of Columbia, she asked one of the detectives from the Metropolitan Police Department if she could "go along with the warrant," and she told him that she was "looking for jewelry." Neither the affidavit nor the warrant mentioned jewelry, and it is clear that the officers from the Metropolitan Police Department were not looking for jewelry specifically. Their search was related to the robbery of the Uptown Theater, which did not involve jewelry in any way. Moreover, no evidence was presented at the suppression hearing to demonstrate the incriminating nature of the jewelry or of a jewelry tag that was also seized from appellant's apartment. Clearly, Detective Bond's reliance on the search warrant obtained by the Metropolitan Police Department was objectively unreasonable. As a result, the good faith exception to the warrant requirement is not applicable in this case.

■ The "plain view" exception also is inapplicable. It requires that the evidence seized must be in plain view and that probable cause exists to believe it is evidence of a crime. *Arizona v. Hicks,* 480 U.S. 321, 326–27, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Aiken v. State,* 101 Md.App. 557, 570, 647 A.2d 1229 (1994)(there must be probable cause to believe that the item spotted in plain view is evidence of a crime). The State requests that we grant a limited remand to determine where the items were seized in appellant's apartment in order to determine whether those items fall within the plain view exception. We need not do that, however, because it is clear that there was no probable cause to believe that the jewelry seized from the apartment was evidence of a crime.

The record justifies no more than a mere suspicion on the part of Detective Bond that the jewelry found in appellant's apartment was stolen from the Hecht's department store on May 1, 1999. Detective Bond testified at the hearing on the motion to suppress that as a result of the search "[w]e also recovered a couple pieces of jewelry that I felt may have been stolen from either Hecht's or Lord and Taylor's." It is clear, however, that the incriminating nature of the jewelry seized at the Longfellow Street apartment became apparent only after the seizure. Detective Bond testified that only after the seized jewelry was examined by a representative of Finlay Fine Jewelry was it determined that the jewelry had been stolen from Hecht's. Accordingly, the trial court erred in denying the motion to suppress with respect to the pieces of jewelry that were seized from the Longfellow Street apartment.

■ With respect to the pawn receipts, the officers were clearly authorized to seize "personal papers showing residence" and, therefore, seizure of the pawn receipts was proper.

■ Having determined that the trial court erred in denying the motion to suppress with respect to the jewelry seized from appellant's apartment, we must now determine whether the admission of that evidence at trial was harmless error.

The test for harmless error in criminal cases was set forth in *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976), as follows:

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

Our independent review of the record leads to the conclusion, beyond any reasonable doubt, that the admission of the jewelry seized at the Longfellow Street apartment in no way contributed to the rendition of the guilty verdict because it was cumulative in nature. The great majority of the jewelry alleged to have been stolen by appellant was recovered from area pawn shops as a result of the seizure of the pawn receipts. The record reflects that only a small amount of jewelry, consisting of six earrings and a small assortment of items contained in a jewelry box, were taken from appellant's apartment. On the other hand, six bags of jewelry containing, *inter alia,* a tennis bracelet, a wedding set, numerous pairs of earrings and single earrings, necklaces, a heart pendant, and an anklet were recovered from area pawn shops after having been pawned by appellant. These pieces of jewelry were admitted properly in evidence at the trial below. The denial of the motion to suppress with respect to the jewelry seized from the Longfellow Street apartment, and the subsequent admission in evidence of that jewelry was, therefore, harmless error.

## II.

Appellant complains that the trial court erred in permitting Detective Bond to testify that both White and Jones were very certain in their identification of appellant in photo-

graphic arrays. At trial, Detective Bond gave the following testimony:

Q. Now did you ask either Mr. White or Ms. Jones what their level of certainty was?

A. No.

Q. Why not?

A. Well, first off, I've never done it, but secondly I can usually tell by their response—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. —whether I feel they're certain or not. And I felt in both cases they were very certain.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. And how long did it take each of them to make their selection?

A. Mr. White probably, you know about 30 seconds; Ms. Jones probably just a little bit longer.

Q. Did they ever pick up anybody else and indicate to you that there might be somebody else—?

A. No. No.

Q. Would you have written that down if they had?

A. Yes, I would have.

Appellant contends that Detective Bond's testimony was inadmissible as a matter of law because it invaded the province of the jury. Relying on *Bohnert v. State*, 312 Md. 266, 278–79, 539 A.2d 657 (1988), appellant claims that the admission of Detective Bond's testimony encroached on the jury's function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve the contested facts. In *Bohnert*, the Court of Appeals stated:

In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury.... It is ... error for the court to permit to go to the jury a statement, belief, or opinion of another

person to the effect that a witness is telling the truth or lying.

\* \* \*

It is the settled law of this State that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law.

*Bohnert,* 312 Md. at 277–78, 539 A.2d 657.

The question before us, then, is whether Detective Bond was offering an opinion as to the credibility of White and Jones. The Court of Appeals' decision in *Conyers v. State,* 354 Md. 132, 729 A.2d 910 (1999), offers guidance on this point. In *Conyers,* a police officer testified that he was able to verify certain statements made by the defendant's cellmate, relating to inculpatory statements made by the defendant. At trial, the police officer testified:

Yes, sir. There was a significant number of statements that were made by Mr. Johnson, some factual statements that were made by Mr. Johnson that were not included in the application for statement of charges and/or the affidavit for the search and seizure warrants that myself and my partner obtained. *These statements which I knew upon hearing them from Mr. Johnson to be truthful, and I was able to verify each and every statement that he gave us.*

*Conyers,* 354 Md. at 153, 729 A.2d 910 (emphasis in original).

The Court of Appeals determined that Conyers' reliance on the *Bohnert* case was misplaced because the police officer was not offering an opinion about the credibility of the cellmate. Instead, the police officer was "stating that certain information [the cellmate] had supplied him with prior to trial was not contained in Appellant's papers and, because he was able to confirm that information, he regarded it as accurate and, therefore, truthful. *Conyers,* 354 Md. at 154, 729 A.2d 910.

In the case at hand, Detective Bond never testified that White and Jones told the truth or that they were credible witnesses. She merely testified that they appeared to be

certain in their identifications. The witnesses could be right or wrong. The disputed testimony may be relevant to the witnesses' credibility but no more so than the disputed testimony in *Conyers*. White testified that he was "positive" that appellant was the robber with the gun. When asked whether there was any doubt in his mind, White stated "Oh, no. No. There's no doubt at all." Similarly, Jones testified that when she was shown photographs after the robbery, she "was a hundred percent sure" that she identified the two people who robbed the store. We find no error in the trial court's admission of Detective Bond's testimony.

## III.

During the course of the trial, the prosecutor informed the court and defense counsel that the State had recently learned of a witness named Mark Lee and that it might call Lee to testify. The prosecutor proffered that Lee would testify that he knew both of the defendants and that the defendants knew each other because he has seen them together. On the morning of May 23, 2001, the State informed the trial judge that Mr. Lee was at the courthouse and that the State "may be interested in calling him as a witness in this case." Later that morning, the State proffered that Mr. Lee, Candice Lee's brother, would testify that he knows appellant "in part because [appellant] was dating his sister." Mr. Lee would further testify that he had been to appellant's apartment at 723 Longfellow Street and that appellant had been to his family's home in the summer of 1999. Lee would also testify, *inter alia,* that he knew Shuebrooks. According to the prosecutor, Lee initially gave one version of events indicating that he had seen both appellant and Shuebrooks on the same block in the District of Columbia, but later he "appeared to back off when he indicated that he does not want to be a witness of course, and he told me that as well." Over objection by counsel for both appellant and Shuebrooks, the trial judge ruled that the State could call Lee.

Subsequently, counsel for appellant informed the court that he and the prosecutor had met with Lee. Appellant's counsel

proffered that Lee would testify that he did not know if appellant and Shuebrooks knew each other. Defense counsel again objected to Lee's testimony on relevance grounds, but subsequently, all counsel agreed to a stipulation with respect to the substance of Mark Lee's expected testimony.

Later, counsel for appellant informed the court that "I need to take back our stipulation as to Mark Lee, and I am going to need Mark Lee to testify." After lunch, counsel for Shuebrooks advised the court that he had spoken to Lee, and Lee would deny the questions expected to be put to him by the prosecutor. Counsel for Shuebrooks renewed his objection, and appellant himself then objected. During a bench conference that did not include the prosecutor, counsel for appellant informed the court and counsel for Shuebrooks that, during a break, he had been handed a police report. Counsel requested that the trial court admit in evidence a portion of the police report because it indicated that Mark Lee had confessed to two police officers that he had committed the robbery in Montgomery County with Shuebrooks. Counsel advised the court that Lee had previously told him that, if called to testify, he would deny that information.

The trial judge denied the request to admit in evidence that portion of the police report, but stated that counsel could call Lee and ask him questions. Appellant's counsel then informed the court as follows:

Judge, because Mr. Nero does not want me to ask questions, we revoke back the stipulations that we entered into this morning. I apologize for wasting the Court's time.

A bench conference was conducted, after which the parties entered into the following stipulation:

[Prosecutor]: Your Honor, the first stipulation is as follows.

The parties hereby stipulate that Mark Lee would have testified under oath that he is Candice Lee's brother, he saw James Nero in June 1999, in Washington, D.C. James Nero was dating his sister Candice.

He also knows Robert Shuebrooks. He saw Mr. Shue-
brooks in June 1999, in Washington, D.C. He saw Mr.
Shuebrooks at least three times in 1999.

He would testify that he has not seen them together and
does not know that they know each other.

He would also testify that he has pawned jewelry in the
past.

This stipulation was read to the jury.

While the jury was deliberating, counsel for appellant
moved for a mistrial based on the court's decision not to admit
the portion of the police report in question and because
appellant's counsel thought "it was ineffective of me to allow
the stipulation regarding Mr. Lee with the information I had
at that time." The following colloquy occurred:

THE COURT: Well, your client directed you to allow that
stipulation.

[Appellant's Counsel]: Judge, I made my motion, and I
know the Court will rule accordingly.

THE COURT: I mean, these are trial decisions that are
made for one reason or another, and there was plenty of
opportunity to—in fact, we recessed early because of the
anticipated testimony of Mr. Lee to allow discussions to
take place between counsel and your client, between you
and Mr. Nero, [Shuebrook's counsel], and Mr. Shuebrooks
as to the impact of Mr. Lee's testimony and what he was
going to say and the significance of that testimony and
make a decision with respect with what to do.

And, so there was ample opportunity to assess what that
testimony was going to be and how best to deal with it, and
a decision was made to stipulate to it, and it was a decision
that was made at the bench that your client directed you to
stipulate to.

[Appellant's Counsel]: Understood.

THE COURT: I mean, I do not see any basis for granting a
mistrial. The evidence came in, decisions were made by
counsel based upon the posture of the case, and the tactics
needed to be utilized at that time, and you and Mr. Nero

had ample opportunity to review and discuss the decision to be made, and your client made a decision to allow the stipulation to go forward.

Where did that State's exhibit—not State's exhibit, but Nero Exhibit 7 [the portion of the police report], where did that come from?

[Appellant's Counsel]: I am not at liberty to say right now.

THE COURT: How long had it been in your possession?

[Appellant's Counsel]: At the time I was at the bench, perhaps an hour.

THE COURT: And you cannot say where it came from?

[Appellant's Counsel]: I did not have it at the time [we] began this trial. I did not have it at the time we were in evidence, I did not have it until, you know, an hour before we were at the bench yesterday.

THE COURT: Well, did the State or any of its agents have it?

[Appellant's Counsel]: I imagine so, but I do not think [the prosecutor] had it—well I do not think [the prosecutor] has it.

THE COURT: Okay, so he was unaware of it.

[The Prosecutor]: It's a little hard for me to answer for myself.

THE COURT: I understand.

[Appellant's Counsel]: I trust he wasn't, I trust that he wasn't aware of it.

THE COURT: Okay. So he was unaware of it?

THE COURT: Okay. I certainly do not think it was ineffective of you to agree to the stipulation after having been thorough in advising your client throughout the course of the trial, and you made a decision based upon the posture of the case, the tactics, to proceed in the fashion that you did. So I will deny the motion for a mistrial.

Appellant contends that the trial court erred in not admitting the police report which purportedly contained exculpatory evidence from Lee. Appellant contends that Lee's statement

was reliable and should have been admitted as a declaration against penal interest.

A declaration against penal interest is a recognized exception to the hearsay rule and, if the declarant is unavailable, is admissible under certain circumstances. Md. Rule 5–804(b)(3); *Gray v. State*, 368 Md. 529, 537–47, 796 A.2d 697, 701–07 (2002); *State v. Matusky*, 343 Md. 467, 477–79, 682 A.2d 694 (1996). Although appellant acknowledges that Lee did not meet the technical requirement of unavailability as specified in Md. Rule 5–804, he claims that Lee was effectively unavailable because counsel proffered that if Lee were asked questions regarding the statement contained in the police report, he would respond with denials.

We disagree. A trial court's decision regarding the admission of evidence is committed to the sound discretion of the trial court. *Merzbacher v. State*, 346 Md. 391, 404, 697 A.2d 432 (1997). We will only reverse, therefore, if the trial court abused its discretion. In the case before us, it is clear that the police report that appellant sought to have admitted in evidence was hearsay. As a general rule, hearsay is not admissible. Md. Rule 5–802. There are a number of exceptions to this general rule. Among them is that a declaration against penal interest is admissible if the declarant is unavailable and the trial court finds the statement sufficiently trustworthy. Md. Rule 5–804(b)(3).

Rule 5–804(a) sets forth five situations in which a witness may be considered unavailable. It provides:

(a) *Definition of unavailability.* "Unavailability as a witness" includes situations in which the declarant:

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement;

(2) refuses to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;

(3) testifies to a lack of memory of the subject matter of the declarant's statement;

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subsection (b)(2), (3), or (4) of this Rule, the declarant's attendance or testimony) by process or other reasonable means.

None of the definitions of unavailability applies in this case. Notwithstanding the proffer, it is clear that Lee was available to testify and he could have been called to answer questions. Appellant chose not to ask Lee a single question.

■■■■ With respect to the trial court's denial of appellant's motion for mistrial, we recognize that the declaration of a mistrial is an extraordinary act that should only be granted if necessary to serve the ends of justice. *Braxton v. State,* 123 Md.App. 599, 666–67, 720 A.2d 27 (1998). The decision to grant a mistrial lies within the discretion of the trial judge, and we will not reverse the trial judge's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial of the motion for mistrial constituted an abuse of discretion. *Id.* at 667, 720 A.2d 27. "Abuse of discretion will not be found unless it is clear that there has been 'egregious prejudice' to the defendant." *Id.*

In the case at hand, appellant suffered no prejudice. Lee was available to testify and appellant decided not to call him as a witness. Under these circumstances, we cannot say that the trial court abused its discretion in denying the motion for mistrial.

## IV.

Appellant next contends that the trial court erred in denying his motion for new trial. Appellant claimed that he was entitled to a new trial because the State was in possession of the police report, discussed *supra,* which contained potentially exculpatory evidence relating to a confession by Mark Lee.

Specifically, the police report contained the following statement:

> Suspect Lee advised that he did in fact wish to talk to me about the armed robbery. Suspect Lee stated that suspect Robert Milton Shu[e]brooks approached him during the first week of July 1999. He stated that Shu[e]brooks was looking for Lee's sister's boyfriend, James Nero. **Suspect Lee advised that Lee and Shu[e]brooks had performed an armed robbery of a Hecht's store in the Montgomery County area.** Suspect Lee continued to state that suspect Shu[e]brooks was looking for Nero to conduct the above case and was unaware that Nero had been arrested already. (Emphasis added).

Appellant maintains the State had a duty to disclose the police report to the defense in a timely fashion.

In addition, after trial, appellant's counsel obtained a transcript of a statement Lee had given Detective Daniel Alioto of the St. Mary's County Sheriff's Office. Appellant argued at the hearing on the motion for new trial that Lee's statement was exculpatory in nature and should have been produced in discovery. According to appellant, even though Lee's statement implicated appellant in the Hecht's robbery, it revealed a very similar *modus operandi* ("MO") between the Hecht's robbery in May 1999 and a robbery in St. Mary's County about 2 months later. Lee indicated that he and Shuebrooks were involved in the St. Mary County's robbery. In addition, appellant argued that Lee and Nero had similar physical characteristics.

Finally, appellant claimed that some of Detective Bond's notes indicated that she had met with Detective Alioto, and therefore, a connection was established between the two detectives and a sharing of information might have occurred. Appellant requested permission to question Detective Bond about her contacts and communications with the St. Mary's County Sheriff's Department. The court conducted an evidentiary hearing.

Detective Bond testified that she had not seen the police report purportedly containing Mark Lee's confession until after appellant's trial. She also testified that she had not received any information from Detective Alioto indicating that Lee had confessed to committing the Hecht's robbery. Detective Bond acknowledged that she had spoken to Detective Alioto in August and September, 1999. Based upon her conversations with Detective Alioto, Bond learned that Mark Lee had allegedly worn a wig and had used a handgun in the jewelry store robbery in St. Mary's County. That robbery occurred after the Hecht's robbery that is the subject of the instant case. Bond was aware that there were physical similarities between Mark Lee and appellant and that the same MO had been used in the Hecht's robbery and the St. Mary's County robbery. Bond testified, however, that "it kind of all came together" when she obtained information from Detective Alioto that Shuebrooks "picked up" with Lee after appellant had been arrested. Bond maintained that Shuebrooks and Lee used the same MO in the St. Mary's County robbery as had been used in the Hecht's robbery because it had worked the first time. Bond concluded that Lee was not involved in the Hecht's robbery.

Appellant contends that Bond knew almost two years before trial that there had been a robbery similar to the Hecht's robbery involving Lee, who was physically similar to appellant, and that this evidence, which is exculpatory in nature, should have been disclosed. At the hearing on his motion for new trial, appellant claimed that the failure to disclose this information violated Md. Rule 4–263, which provides, in pertinent part:

Discovery and inspection in circuit court shall be as follows:

(a) Disclosure Without Request. Without the necessity of a request, the State's Attorney shall furnish to the defendant:

(1) Any material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged;

Appellant further claimed that the failure to disclose the information violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. The trial court denied the motion for new trial.

■■■ The denial of a motion for new trial is normally subject to reversal only when the trial court abuses its discretion. *Merritt v. State,* 367 Md. 17, 28–31, 785 A.2d 756 (2001). In *Merritt,* the Court of Appeals recognized:

[T]he breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice.

*Merritt,* 367 Md. at 30, 785 A.2d 756.

The Court in *Merritt* added, however, that "when an alleged error is committed during the trial, when the losing party or that party's counsel, without fault, does not discover the alleged error during the trial, and when the issue is then raised by a motion for a new trial, we have reviewed the denial of the new trial motion under a standard of whether the denial was erroneous." *Merritt,* 367 Md. at 31, 785 A.2d 756. If we find that the trial court erred, the harmless error standard is utilized to determine the prejudicial effect, if any, of the error. *Id.*

In the case *sub judice,* the result would be the same whether the denial of the motion for new trial is reviewed under an abuse of discretion standard or under the standard of error. Nevertheless, the denial of appellant's motion for new trial with respect to the police report should be reviewed under the standard of whether there was error committed

and, if so, whether it was harmless error. The denial of appellant's motion for new trial with respect to Lee's statement should be reviewed under the abuse of discretion standard.

With respect to the police report, we have already discussed, *supra*, the court's decision not to admit it in evidence. With respect to appellant's contention that there was a *Brady* violation, we find no error in the trial court's denial of the motion for new trial. In *Wilson v. State*, 363 Md. 333, 768 A.2d 675 (2001), the Court of Appeals stated that in order to establish a *"Brady* violation," the moving party must establish " '(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material.' " *Wilson*, 363 Md. at 345–46, 768 A.2d 675 (quoting *Ware v. State*, 348 Md. 19, 38, 702 A.2d 699 (1997)). Evidence is considered material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ware v. State*, 348 Md. 19, 38, 702 A.2d 699 (1997)(quoting *State v. Thomas*, 325 Md. 160, 190 n. 8, 599 A.2d 1171 (1992)).

It is undisputed that appellant was in possession of the police report during the trial. For reasons set forth more fully *supra*, the police report was inadmissible at trial because Lee was available to testify and appellant made the tactical decision not to call Lee as a witness.

With respect to the transcript of Lee's statement to Detective Alioto, we hold that the trial court did not abuse its discretion in denying the motion for new trial. Appellant contends that there is a reasonable probability that a different result would have been had at trial if he had been aware that Lee had committed a robbery in St. Mary's County with Shuebrooks while wearing a wig and using a gun. We disagree. Information about the St. Mary's County robbery and

the fact that Lee wore a wig and used a gun was contained in the police report that was made available to appellant during the trial. Moreover, the police report specifically stated that "Suspect Lee gave a taped statement regarding this case . . ." It was appellant's decision not to call Lee as a witness during the trial. Since appellant was in possession of information at the time of the trial pertaining to the techniques used in the St. Mary's County robbery, there is no reasonable probability that a different result would have been had if he had been provided a copy of Lee's statement. Accordingly, we find no abuse of discretion on the part of the trial judge in denying the motion for new trial.

## V.

■■■ Appellant's final contention is that the trial court erred in instructing the jury as follows:

> Your verdict should only be arrived at after careful and thoughtful deliberations, and it may be helpful to listen to and consult with each other and to discuss the evidence and the inferences to be drawn therefrom freely and fairly in a sincere effort to arrive at a just verdict.
>
> This, however, does not mean that any juror is required to yield a guilty conviction after consultation or deliberation. Remember that you are not partisans or advocates, but rather jurors.

Although appellant failed to object to this instruction, he urges us to reverse his trial on the grounds of plain error. Md. Rule 4–325(e)("An appellate court . . . may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite failure to object.") We decline to do so.

Appellant's complaint is with respect to the first sentence of the second paragraph, which he claims altered the burden of proof. He claims that "[n]othing could be more prejudicial to the rights of the defendant than the failure to clearly instruct the jury as to the burden of proof."

We have previously held that, if the "law is fairly covered by the jury instructions, reviewing courts should not disturb

them." *Tharp v. State,* 129 Md.App. 319, 329, 742 A.2d 6 (1999), *aff'd,* 362 Md. 77, 763 A.2d 151 (2000). The trial judge gave the following instructions concerning the burden of proof:

The defendant is presumed to be innocent of the charges. That presumption remains with the defendant throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the trial.

The defendant is not required to prove his innocence. However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty, nor is the State required to negate a preconceivable circumstance of innocence.

A reasonable doubt is a doubt founded upon reason. Proof beyond a reasonable doubt requires such proof as will convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs.

However, if you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exist[s] and the defendant must be found not guilty.

You must consider and decide this case fairly and impartially. You are to perform this duty without bias or prejudice as to any party. You should not be swayed by sympathy, prejudice or public opinion.

\* \* \*

The burden is on the State to prove beyond a reasonable doubt that the offense was committed, and that the defendant was the person who committed the crime.

Clearly, the burden of proof was fairly and adequately covered in the court's other instructions. We shall not disturb them.

**JUDGMENTS AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**