814 A.2d 41

**Renard CRAIG**

v.

**STATE of Maryland.**

No. 1814, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 24, 2002.

Julia D. Bernhardt and Deborah S. Richardson, Asst. Public Defenders (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Douglas Gansler,

State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued Before JAMES R. EYLER, GREENE, and SHARER, JJ.

SHARER, Judge.

Appellant, Renard Craig, was charged in the Circuit Court for Montgomery County with felony theft and possession of drug paraphernalia. On October 3, 2001, Craig's pre-trial motion to suppress was heard and denied. On October 3 and 4, 2001, Craig was tried before a jury, which found him guilty of misdemeanor theft and possession of paraphernalia. He was sentenced to 18 months incarceration on the theft count.

On appeal, Craig raises the following questions:

I. Did the lower court err in denying appellant's motion to suppress?

II. Did the trial court err in admitting irrelevant and prejudicial evidence regarding the investigatory history of the case, including testimony about why the police stopped appellant?

For the following reasons, we answer in the negative and affirm.[1]

## DISCUSSION

### I. Did the lower court err in denying appellant's motion to suppress?

Craig first assigns error to the trial court's denial of his motion to suppress. He asserts (1) that the police did not have reasonable articulable suspicion to stop and frisk him and (2) that a statement made by him was the result of a custodial interrogation at a time before he had been read his rights

---

1. Craig does not raise the sufficiency of evidence. Accordingly, we need state only those facts that are necessary to provide the context for our analysis of the issues raised on appeal.

under Miranda. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The appropriate standard of review of the denial of a motion to suppress evidence was recently articulated by Judge Cathell in *State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660 (2002):

> Our review of a Circuit Court's denial of a motion to suppress evidence under the Fourth Amendment is limited, ordinarily, to information contained in the record of the suppression hearing and not the record of the trial. *See Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999); *In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691, 693 (1997); *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, 22 (1990); *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749, 755 (1987). When there is a denial of a motion to suppress, we are further limited to considering facts in the light most favorable to the State as the prevailing party on the motion. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Simpler*, 318 Md. at 312, 568 A.2d at 22. In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to the weighing and determining first-level facts. *Lancaster v. State*, 86 Md. App. 74, 95, 585 A.2d 274, 284 (1991); *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356, 358 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. *McMillian v. State*, 325 Md. 272, 281–82, 600 A.2d 430, 435 (1992); *Riddick*, 319 Md. at 183, 571 A.2d at 1240. Even so, as to the ultimate conclusion of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick*, 319 Md. at 183, 571 A.2d at 1240; *Munafo v. State*, 105 Md.App. 662, 669, 660 A.2d 1068, 1071 (1995).

Because the State was the prevailing party, we will consider the facts in a light most favorable to the State.

The only witness to testify at the suppression hearing was Sergeant William Hill of the Montgomery County Police Department, Bethesda Division (MCPD), who was called by the State. Hill's uncontroverted testimony can be summarized as follows.

In May 2001, Hill was assigned to the Delta 2 beat, in downtown Bethesda, to investigate, among other things, commercial burglaries. On May 23, 2001, at about 4:00 p.m., while driving to work, Hill heard three separate calls from dispatch regarding "a suspicious person in progress" at 7910 Woodmont Avenue, a high-rise office building ("at least twelve floors") in downtown Bethesda. The man was described as a black male, in his twenties, approximately 5'4", wearing a blue ball cap, a black shirt with white writing, and carrying a black bag. The calls also reported that the person matched the description of a suspect on a printed alert issued by the MCPD in November 2000, calling attention to a "recent rash of thefts from offices" in downtown Bethesda.[2] The flyer included descriptions of three suspects in some of the recent unsolved thefts and burglaries. It was admitted into evidence at the suppression hearing.

When Hill arrived at 7910 Woodmont, there were reports that the suspect was on one of the upper floors of the building. Two other officers who had responded went to the upper floors to make contact with the person who had telephoned the complaint, while Hill remained in the lobby. After a few minutes, Hill saw a man who matched the dispatch description emerge from the elevator. That man was Craig.

Hill was not in uniform, but was wearing a jacket and tie, and holding a walkie-talkie. Craig locked eyes with Hill, stopped "dead in his tracks," stared for a moment, "made an about face," and took a few steps in the opposite direction. Hill noted that Craig had a bag in one hand, but could not see his other hand because of a jacket draped over that arm. Hill

---

2. The alert is referred to throughout the transcript as the "burglary flyer" or "the flyer."

said, "County Police, I need to see your hands." Craig stopped walking away and Hill said, "I need you to put your hands up on the wall." Craig did not comply, but responded, "I didn't steal anything." When Craig did not move, Hill physically moved him to the wall and Craig then put his hands on the wall. Hill radioed the other officers in the building, reported that he thought he "had the guy in the lobby," and asked for assistance.

When Hill asked Craig what was in the bag, Craig replied that it was a laptop. Hill asked Craig if it was his and Craig responded, "No, I found it." Hill asked Craig again whose laptop it was and Craig responded, "I'm holding it for a friend."

Hill testified that he was alone in the lobby, did not have his bulletproof vest on, and was concerned for his safety. Hill added that he could see that Craig had things in his pockets, but that he did not know what they were. Thus, Hill patted down Craig's outer clothing to make sure he did not have a concealed weapon.

In the course of the pat-down, Hill felt what he described as a hard thin object in Craig's back jeans pocket that he thought could be a "screw driver without a handle," or an "ice pick without a handle." Hill asked Craig what it was and Craig did not answer. Hill then removed the object from Craig's pocket and discovered it was a five or six inch piece of straight wire, which was burnt on one end. Thinking it was drug parapher- nalia, Hill then asked Craig, "This looks like something you use for a crack pipe. Do you have any crack on you?" Craig responded, "Yeah, I smoke." Based on that answer, Hill conducted a search of Craig's pockets and found two straws that were cut in half, with white residue on them, and several small colored zip lock baggies with white residue in them. Based on his training and experience, Hill believed the sub- stance to be residue of a controlled dangerous substance.

Craig was eventually handcuffed and taken to the police station. At the station, Craig was advised of his rights and

agreed to give a written statement to the police.[3]

After Hill's testimony, Craig argued that the police did not have reasonable suspicion to stop and frisk Craig, that Craig was actually placed under arrest when Hill put his hands on the wall, and therefore any statements made by Craig after that point were the result of a custodial interrogation when he had not yet been Mirandized. The lower court denied Craig's motion to suppress, ruling orally:

> THE COURT: I think both counsel in this case certainly make very good and compelling arguments from their respective points of view. I think what's important when you are analyzing police activity is that you really have to look at it sequentially, and you can't put aside your common sense as to what a police officer knows when he or she is about the business of investigating reported criminal activity.
>
> So, when we're talking about Detective Hill, the first thing we have to acknowledge is that this was Detective Hill'S [sic] area; he was involved in these investigations of these commercial burglaries and thefts; he was very aware of all the other incidents which don't involve this case, and he along with Officer Gill had put together basically a composite of three individuals that they had reason to believe from going through police reports were committing commercial burglaries and thefts in the Bethesda area. That's the genesis of State's Exhibit No. 1, which alerts business owners and property owners to a rash of thefts from offices during which were taken purses, laptops and money, and then some descriptions.
>
> So, against that background what we do is then we fast forward to this particular day in question when Officer Hill was going on duty hears three dispatches over the police radio, and all three dispatches are fairly consistent. They contained a very detailed description of what's reported to be the person suspected of being the purse thief, or the

---

3. Craig denied stealing the laptop, claiming to have found it at a Metro station.

person suspected of being the office burglar, and it's not vague. The others may be broad, but this one is certainly not broad. The description that he heard, repeated several times, though it had some variations was basically a black male 5'4", blue ball cap, black or blue shirt with white writing on it, in his twenties and carrying a black bag.

Furthermore, it was specific to a building, and as events progressed it varied by floor. Further information Detective Hill had was this person suspected of being the thief was in this building engaged in suspicious activities. We would, I think, chastise any police officer who didn't respond to this location to further investigate when there has been an ongoing problem in this particular area. That's the information that Sgt. Hill had, and that's the background that he enters this particular investigation with.

When he gets on the scene he talks to two other officers who are also involved in this investigation and he now has information that the suspect, the person reported to them in these three calls, is on an upper floor. So the two other officers go up and he decides he's going to sit in the lobby and he's going to see what unfolds. Lo and behold he sees an individual emerge from the elevator who happens to be Mr. Craig, but is wearing the outfit that has been reported to him over the police radio in detail. So he matches very closely the description. And certainly at that point the officer had a reasonable suspicion that criminal activity was afoot in the building and he certainly had a reasonable basis to accost Mr. Craig, and Mr. Craig reacts in a manner that only enhances the detective's suspicions by immediately saying I didn't steal anything, and then when the officer says show me your hands, not being eager to comply with those directions. At that point the officer does escort him to the wall and make sure he has both hands on the wall, says what's in your bag, he's told a laptop. Whose is it? First he's told I found it, then he's told I'm holding it for a friend.

What we're really looking at here, and I think [the State] has analyzed it correctly, is we are looking at an investiga-

tion and not at this point an arrest. The officers do have a right to ask preliminary investigative questions. The responses that Sgt. Hill receives from Mr. Craig really only enhance his suspicion. He's alone in the lobby; he's waiting for other officers to arrive; he has reasonable articulable suspicion that he's dealing with somebody who may be responsible for a series of burglaries or theft. This individual has bulges in his pockets. I think it is perfectly reasonable, when he states that he's afraid and he's on his own, that he could conduct his own that he could conduct a Terry patdown search to see whether or not the suspect had any weapons. What he feels, and the only thing that he reports at least in the evidence before me taking out, is what he said could have been handleless ice pick or a handleless screwdriver and it turns out to be a wire. He said it's burnt at one end. His training and experience leads him to believe this was some type of controlled dangerous substance paraphernalia. He asked Mr. Craig about that, and Mr. Craig says yeah I smoke. A resaonable [sic] officer then with background and training knows that somebody who uses illicit drugs is very likely to be carrying them, so I think it was certainly reasonable for him to conduct a further search at that time to see whether of not there was any kind of controlled dangerous substance on Mr. Craig.

If you don't look at the events in sequence and really don't analyze specifically how they unfold and how quickly they unfold and against what background, I certainly can understand why [defense counsel] raises the points that he's raising. We certainly don't want people to be stopped on the basis of unsupported profiles. But I certainly don't think that was the situation in this case. I think the officer's activity was very specifically direct[ed] to one individual of whom they had a detailed description, and Mr. Craig emerged at the place and at the time dressed identically to that report. So I think the officer's conduct from that point further was appropriate to have had an accosting, to make a stop, to conduct a Terry patdown, to then conduct

a search for contraband, and then to make the arrest. And I do think the arrest was the last event, based on probable cause, so I will deny the motion to suppress.

Following the oral ruling, defense counsel posed an inquiry to the court:

DEFENSE COUNSEL: Your Honor, I'm curious. You said he had a right to search for contraband?

THE COURT: Upon the removal of what he believed to be a piece of drug paraphernalia.

DEFENSE COUNSEL: What type of search is that?

THE COURT: That's a search for contraband based on probable cause.

### The Stop

Our initial concern is the constitutional propriety of Hill's stop of Craig. The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures by government officers. U.S. Const. amend. IV. "The protections of the Fourth Amendment are applicable to the State of Maryland through the Fourteenth Amendment of the United States Constitution." *State v. Collins,* 367 Md. 700, 707, 790 A.2d 660 (2002) (citing *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). " 'The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures.' " *Id.* at 708, 790 A.2d 660 (emphasis in original) (quoting *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59 (1991)).

A police officer may direct an inquiry to a citizen, even when he or she has no cause for doing so and it may be entirely appropriate for that citizen to decline "to stop or respond to such inquiries." If the officer does nothing more, takes no further action, then no seizure will have occurred. Under the Fourth Amendment, an officer may make a forceable stop of a citizen, however, if the officer has reasonable grounds for doing so.

*Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612 (2001) (internal citation omitted).

For purposes of our *de novo* review, we assume that Craig was "seized" within the meaning of the Fourth Amendment when Hill shouted "County Police. I need to see your hands." This circumstance clearly amounted to "a show of official authority such that 'a reasonable person would have believed that he was not free to leave.'" *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (footnote omitted)). Consequently, Craig stopped, although he did not comply with Hill's request to show his hands.

Under the circumstances, Hill's seizure of Craig was reasonable. Pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), certain seizures are justifiable under the Fourth Amendment if there is reasonable and articulable suspicion that the person is involved in criminal activity. *In re David S.,* 367 Md. 523, 532, 789 A.2d 607 (2002) (citing *Terry, supra,* 392 U.S. at 30, 88 S.Ct. 1868). A police officer who has reasonable suspicion that a particular person has engaged, is engaged, or is about to be engaged, in criminal activity may detain that person briefly in order to investigate the circumstances that provoked suspicion. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing *Terry, supra,* 392 U.S. at 30, 88 S.Ct. 1868; and *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Reasonable suspicion of criminal activity warrants a police officer to temporarily seize the person for questioning limited to the purpose of the stop. *Royer, supra,* 460 U.S. at 499, 103 S.Ct. 1319. In determining whether there was reasonable suspicion, we must look at the totality of the circumstances in each case to see whether the officer had a " 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu, supra,* 534 U.S. at 273, 122 S.Ct. 744 (quoting *Cortez, supra,* 449 U.S. at 417–18, 101 S.Ct. 690). Thus, the question is whether, under the totality of the

circumstances, Hill had reasonable and articulable suspicion to detain Craig. We conclude that he did.

Craig suggests that this Court should apply the factors cited by Professor LaFave in considering the existence, or lack of existence, of reasonable suspicion:

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.4(g), at 195 (3rd ed.1996 & 2000 Supp.) These factors have been discussed by the Court of Appeals in cases involving the constitutional propriety of a seizure. See *Cartnail v. State*, 359 Md. 272, 753 A.2d 519 (2000) and cases cited therein. Application of those factors does not, however, amount to a formulaic or standardized test for determining reasonable suspicion. In the final analysis, there must be a determination as to whether, under the totality of the circumstances there existed a "minimum level of objective justification" for the seizure. *Graham v. State*, 325 Md. 398, 408, 601 A.2d 131 (1992); *Nathan v. State*, 370 Md. 648, 660, 805 A.2d 1086 (2002).

Recently, in *U.S. v. Arvizu, supra,* the Supreme Court had occasion to consider a suppression issue wherein the Ninth Circuit Court of Appeals had applied a "multifactor test" to determine the propriety of a vehicular stop. In reversing, the Court said:

> We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. *[Ornelas v. U.S.*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *U.S. v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Cortez, supra*, 449 U.S. 411, 101 S.Ct. 690]. The court's evaluation and rejection of seven [of ten]

of the listed factors in isolation from each other does not take into account the "totality of the circumstances," as our cases have understood that phrase.

*U.S. v. Arvizu,* 534 U.S. at 274, 122 S.Ct. 744.

■ We consider those factors (or so many of them as are here applicable) in the context of our totality of the circumstances examination. Hill heard three dispatch radio calls. Each stated that individuals from an office high-rise at 7910 Woodmont Avenue, Bethesda, observed a black male, in his twenties, approximately 5'4", wearing a blue ball cap, a black shirt with white writing and carrying a black bag, was acting suspicious. The reports also stated that the description matched that of a suspect on a burglary flyer that Hill had helped create. When Hill observed Craig exit from the elevator, he immediately noticed that Craig matched the descriptions from dispatch. Craig's reaction, upon making eye-contact with Hill, raised more suspicions in Hill. Under the circumstances, the information Hill received from dispatch, and from the other two officers, adequately formed a basis for his articulable suspicion that Craig may have been involved in some criminal activity. This belief by Hill was supported further by his observations when he observed Craig's reactions upon making eye contact at the moment of their encounter. We find that, under the totality of the circumstances, Hill possessed a reasonable and articulable suspicion to believe that Craig may have been involved in theft.

Hill received a particularized description of the person who was thought to be the person described in the flyer. The area in which the suspect might be found was limited to one building, albeit with several levels. The time between the alert and his sighting of Craig was minutes (as contrasted with more than one hour in *Cartnail*). There were relatively few other persons in the area. The direction of his movement, after the sighting, and report, was limited—he could exit the building only by the elevator or a stair well.

We conclude that, in the totality of the circumstances, Hill was possessed of reasonable suspicion to stop Craig as he alighted the elevator.

### The Pat-down

Craig next finds error in the lower court's ruling that Hill had reasonable and articulable suspicion to conduct a pat-down search of Craig. In pertinent part, the lower court ruled:

> He's alone in the lobby; he's waiting for other officers to arrive; he has reasonable articulable suspicion that he's dealing with somebody who may be responsible for a series of burglaries or theft. This individual has bulges in his pockets. I think it is perfectly reasonable, when he states he is afraid and he's on his own, that he could conduct ... a Terry patdown search to see whether or not the suspect had any weapons.

We agree with the lower court that, in the totality of the circumstances, the pat-down was proper.

A police officer may stop and frisk an individual if that officer has reasonable suspicion that an individual is engaged in criminal activity and is presently armed and dangerous. *Russell v. State*, 138 Md.App. 638, 651, 773 A.2d 564 (2001). Here, Hill was alone with a burglary suspect who failed to comply with Hill's initial demand to show his hands. Hill observed that Craig had objects in his pockets and, to ensure his own safety, acted to be certain that Craig did not have any weapons on his person. Therefore, Hill's pat-down of Craig's outer clothing was permissible.

### The Statement

Craig also contends his responses to Hill's questions while still in the building lobby were a result of custodial interrogation, and the lower court erred in not suppressing the statements as a violation of *Miranda*. In *Miranda*, the Supreme Court stated

To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective·means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

*Miranda, supra,* 384 U.S. at 478–79, 86 S.Ct. 1602.

 Thus, the first issue in any *Miranda* violation case is "whether the questioned party was in custody." *Hill v. State,* 89 Md.App. 428, 431, 598 A.2d 784 (1991).

"[C]ustody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. * * *

[T]he custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-investigator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

*Argueta v. State,* 136 Md.App. 273, 764 A.2d 863, (quoting *Myers v. State,* 3 Md.App. 534, 537, 240 A.2d 288 (1968)). " 'Custody' ordinarily contemplates that a suspect will be under arrest, frequently in a jailhouse or station house setting." *Reynolds v. State,* 88 Md.App. 197, 209, 594 A.2d 609 (1991), *aff'd,* 327 Md. 494, 610 A.2d 782 (1992), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). "[E]ven

a legally authorized detention or seizure of the person in the context of a traffic stop or even a *Terry* stop [does] not amount to custody within the contemplation of *Miranda.*" *Id.* at 210, 594 A.2d 609 (discussing *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

 Here, the seizure only rose to the level of a *Terry* stop, investigatory in nature, and brief in duration. Craig was not in custody and his *Miranda* warnings need not have been given at that juncture. We find no error in the court's failure to suppress the statements made by Craig during the course of that initial encounter.

## II. Did the trial court err in admitting irrelevant and prejudicial evidence regarding the investigatory history of the case, including testimony about why the police stopped appellant?

When Hill seized Craig at 7910 Woodmont Avenue, he found Craig carrying a laptop computer in a bag. The laptop was determined to be owned by Complete Actuarial Solutions Company, located on the eleventh floor of 7735 Old Georgetown Road. Although Craig was seized by the police in 7910 Woodmont Avenue, he was charged with theft of the laptop from 7735 Old Georgetown Road.

Immediately prior to trial, Craig moved *in limine* to exclude the testimony of one of the State's witnesses, Helen Green. It was proffered by the State that Green worked at 7910 Woodmont Avenue and observed Craig enter her office and, upon questioning whether she could assist him, quickly leave. After referring to the burglary flyer, she called the police. Craig argued that this testimony should be excluded as not relevant because he was charged with the theft of a laptop from another building, not from 7910 Woodmont Avenue. The Court disagreed and allowed the testimony, finding it relevant to the issue of Craig's intent.

During the State's opening statement, when the prosecutor began discussing Green, and what occurred at 7910 Woodmont Avenue, Craig objected and a bench conference ensued. The

court ultimately granted a "continuing objection to all testimony related to [Craig] being observed in any building," including 7910 Woodmont Avenue and 7735 Old Georgetown Road, prior to encountering Hill.

Craig has launched a two-pronged attack on "irrelevant and prejudicial" testimony regarding (1) his movements just prior to having been stopped by Hill and (2) police investigation of other crimes in the Bethesda area. All of this category of testimony he attributes to the State's witness, Green, and he posits that her testimony was "other crimes" evidence, for which a proper foundation was not laid. Specifically, he asserts that the trial court failed to engage in the three-step analysis that is elemental to the admission of other crimes evidence. *Streater v. State,* 352 Md. 800, 724 A.2d 111 (1999).

Pre-trial, the State proffered that Green would testify that Craig, whom she knew personally, came into the office in which she worked; that she asked if he needed help; that he appeared to be startled; that he then left the office; that she then reviewed the flyer and, seeing what she believed to be a matching description, telephoned the police.

It can be concluded from the record that the State viewed the testimony of Green, in part at least, as other crimes evidence. What is not so certain, however, is whether the trial court treated her testimony as falling within the ambit of other crimes evidence. Craig moved *in limine* to exclude Green's testimony, alluding to, but not articulating, her expected testimony as other crimes evidence. We conclude from the trial judge's ruling on the motion *in limine* that she, likewise, did not consider the proffered testimony to be other crimes evidence. In her ruling she stated

THE COURT: I'll overrule the objection, and I'll allow the State to introduce that evidence. It will require a curative instruction from the Court, so the jury understands the State is not alleging that Mr. Craig committed any other offense, but merely too [sic] explain the observations of the behavior and then allow them to make the connection that

this behavior indicates guilty knowledge that the laptop in his possession was stolen.

The evidence that is proscribed is that of other crimes or bad acts. What Green testified to is neither. There is nothing in her testimony to suggest that she was offering evidence that Craig had committed other uncharged crimes. Nor does her testimony suggest that, during their brief interaction, he was committing a bad act. She merely observed him in a place where she did not expect him to be, noticed that he was startled, and, believing his physical appearance to match that on a flyer, telephoned the police to report her experience with him.

We conclude, therefore, that, because Green's testimony alluded to neither other crimes, nor bad acts, that it was not necessary for the trial court to engage in the analysis commended by *Streater.*

We note in passing that, although, in ruling on the motion *in limine,* the trial court suggested the potential of a curative instruction, none was given, nor was one requested. In view of the cumulative effect of the evidence, the trial court would have been justified in declining to give an "other crimes" instruction, had one been requested by the defense.

Craig also contends that Green's testimony revealed inadmissible evidence of a "police investigation of other thefts in the Bethesda area." The record reveals no such evidence.

In his testimony before the suppression hearing court, Hill provided considerable background information relating to an outbreak of thefts and commercial burglaries in the downtown Bethesda area. He was, in fact, part of a squad that had been given special assignment to "work" those crimes; hence, his particular attention to 7910 Woodmont Avenue, when he received the dispatch on the day of Craig's arrest.

At trial, however, the trial court guided the State away from that detail. The transcript reveals the following from the testimony of Hill on direct.

THE STATE: What were your duties and what were your responsibilities as a detective in Bethesda?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

THE WITNESS: I was assigned the Delta 2 Beat in Bethesda which comprises the downtown area of Bethesda. My main duties were to investigate street robberies, burglaries, and felony thefts, and aggravated assaults.

THE STATE: With respect to thefts in the Bethesda area, what kind of investigations did you undertake?

DEFENSE COUNSEL: Objections.

THE COURT: Sustained.

We can find nothing in Hill's trial testimony that even remotely suggests that the jury was provided with information regarding police investigation of other thefts in Bethesda which might, by any extension, implicate Craig. The bottom line, to use an accounting term, is that he was, after having been lawfully detained, found to be in possession of stolen property.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**