887 A.2d 1095

**William SYKES**

v.

**STATE of Maryland.**

**No. 2818, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Dec. 7, 2005.

Richard W. Winelander (Stanley Needleman on the brief), Baltimore, for appellant.

Celia Anderson Davis (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER, and MEREDITH, JJ.

DEBORAH S. EYLER, J.

William Sykes, the appellant, was tried by the Circuit Court for Baltimore County, sitting without a jury, on a "not guilty agreed statement of facts," and was convicted of possession of cocaine with intent to distribute. The court imposed a sentence of 25 years without parole, upon a finding of subsequent offender status under Md.Code (2002), section 5–608 of the Criminal Law Article ("CL").

On appeal, the appellant raises one question for review, which we have condensed and rephrased: Did the circuit court err in denying his motion to suppress the cocaine he was convicted of possessing?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On February 25, 2004, the appellant was charged with possession of cocaine with intent to distribute, possession of cocaine, attempted bribery of a public employee, and making a false statement to a peace officer.[1] The charges stemmed from events that occurred on the night of January 30, 2004, in the Woodlawn area of Baltimore County. Before trial, the appellant filed a motion to suppress evidence.

At the suppression hearing, the State called Officer Donald Anderson, of the Baltimore County Police Department Woodlawn Precinct Community Action Team, and introduced into evidence an aerial map of Woodlawn and its surroundings.

According to Officer Anderson, on the night in question, he had just executed a search warrant on Townbrook Drive in Woodlawn, when he heard a report over the dispatch, at approximately 9:21 p.m., of an armed robbery at 12 Mountbatten Court, also in Woodlawn. Officer Anderson was accompanied by Officer Waite and Officer Rock.[2] All three officers were in uniform. When the 9:21 p.m. broadcast came in, they were inside Officer Waite's marked patrol car, leaving the search location.

Officer Anderson had been assigned to the Woodlawn area for seven years, four of which were spent on foot patrol. He was acquainted with the area, which consists of many residential apartment complexes. He was familiar with the footpaths in wooded areas behind the complexes that people used to go from one complex to another. He also knew that the residents in that area are predominately African–American.

In the 9:21 p.m. broadcast, the dispatcher said there were two armed robbers described as black males; teenagers; 5′ll″;

---

1. Subsequently, the State *nol prossed* all the charges except possession of cocaine with intent to distribute.

2. The first names of Officer Waite and Officer Rock are not in the record.

wearing all black clothing; and running through Mountbatten Court, which is a dead-end apartment complex, and across Essex Road. The dispatcher also said that police had set up a "perimeter" around nearby streets: Essex Road and Windsor Mill Boulevard, Greenbury Court, Deveraux Court, and Duke of Windsor Court.

Subsequent broadcast descriptions by the dispatcher stated that one suspect was wearing a long black coat, and that two black males were seen running on the trail behind the Duke of Windsor apartment complex.

Using the aerial map, Officer Anderson testified that there are two trails behind the Duke of Windsor apartment complex, both of which lead to Windsor Mill Boulevard, and a wooded area across that boulevard. He further pointed out a trail that runs through the wooded area and leads to another apartment complex, at Richglen Court. The distance on foot from Mountbatten Court, where the robbery occurred, to Richglen Court, through the trail, is about one-quarter mile.

The officers decided to drive to Richglen Court, thinking the suspects might have fled by crossing Windsor Mill Boulevard and taking the trail there through the woods. The drive was about one-ninth of a mile. They arrived at Richglen Court a few minutes before 9:34 p.m.

Upon their arrival at Richglen Court, the officers saw two black men, later identified as the appellant and Theodore Dargon, walking out from a dimly lit area behind an apartment building and in between a dumpster area, about 20 feet from the officers. Dargon was wearing blue jeans and a black sweatshirt; the appellant was wearing blue jeans and a green military-style jacket.

The officers exited the police car, with their guns drawn, and ordered the men to place their hands on the car. Officer Anderson obtained an identification card from the appellant, and then immediately performed a patdown.[3] He employed

---

3. Although not revealed in the testimony, other documents in the record indicate that the name on the identification card was that of another

what he called the standard patdown procedure used by the Baltimore County Police Department: "We start at the head, work down the shoulders and arms, grabbing and crumbling the clothes as we check for weapons." When he moved his hand to the appellant's right outer coat pocket, he "grabbed, crumbled, rolled [his] hand slightly," heard a plastic bag sound and felt two objects that, based upon his knowledge, training, and experience as a narcotics officer, he recognized by feel as "decks" of illegal drugs. He testified that a "deck" is a plastic bag containing about 20 vials of cocaine or heroin. Officer Anderson retrieved the objects from the appellant's pocket and saw that they were decks of cocaine. He placed the appellant under arrest.

One of the other officers performed the patdown of Dargon, which did not reveal anything.

The appellant is 6', 180 lbs., and Dargon is 5'10", 200 lbs. Officer Anderson considered the appellant to be a dark-complected African–American, and Dargon to be a medium-complected African–American. Both men were 26 years old. In Officer Anderson's opinion, however, Dargon looked younger than his actual age, more like a teenager.

The patdowns were completed and the appellant was placed under arrest sometime before 9:34 p.m., when Officer Rock notified the dispatcher that the officers had stopped two men they believed to be suspects in the armed robbery. According to Officer Anderson, Officer Rock had to wait a few minutes to "call out" this information to the dispatcher, because the airwaves were not clear.

At 9:34 p.m., the dispatcher broadcast another description of the armed robbery suspects, stating they were two black males; 16 years old; 5'6"; 150 lbs.; one dark and one medium complected; fleeing on foot toward Essex Road. The dark-complected male was described as wearing a black jacket and

---

individual. That was the basis of the false statement to a peace officer charge brought against the appellant.

having a light moustache; no description of the medium-complected male's clothing was given.

According to Officer Anderson, the appellant and Dargon appeared "startled" upon seeing the police, and asked why the officers were speaking to them. They did not attempt to flee. The officers told them they matched the description of two armed robbery suspects. Both men were cooperative. They said they had been walking from Dargon's apartment, which was nearby.

Upon being arrested, the appellant told the officers that Dargon could get some money for them if the officers would release him. The officers allowed Dargon to return to his apartment. When Dargon came back, he handed Officer Anderson $200. Dargon then was placed under arrest for attempted bribery of a public employee.

Officer Anderson testified that the direction from which the two men were proceeding was consistent with their statement that they had just left Dargon's apartment. He further testified that a "show-up" was conducted soon after the men were arrested and the robbery victim said they were not the robbers.

The appellant testified on his own behalf at the suppression hearing. He said that Officer Anderson pulled his identification from his back pants pocket after the patdown. He further stated that, during the patdown, he gave Officer Anderson his name and explained that they had been leaving Dargon's apartment. Finally, he gave his height and weight, and commented that he is considered a light-complected African–American.

In oral argument to the motion court, defense counsel maintained that the stop and frisk of the appellant was not based upon reasonable suspicion as required by the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Specifically, he argued that the two men did not match the description of the robbery suspects. Relying upon the last broadcast description, made at 9:34 p.m., he pointed out that the men were ten years older than the

suspects; 4–6 inches taller; 30–50 pounds heavier; were wearing clothing not matching the description; and did not act in a way that would arouse suspicion. Additionally, the men were in a heavily populated area where a majority of the residents are African–American.

Defense counsel also argued that the patdown exceeded the scope of a permissible *Terry* frisk because it could not have been immediately apparent to Officer Anderson that the item in the appellant's pocket was contraband.

The prosecutor responded that the stop was based upon reasonable suspicion and therefore was proper under *Terry*. He pointed out that Officer Anderson stopped the two men before the last and more detailed broadcast description went out. Based upon the initial descriptions, the height difference was only 1–2 inches, and both men were wearing dark clothing, which could have been mistaken for black in the dark. The men were detained soon after the robbery was committed in an area near the crime scene where the two suspects were seen running. There were no other people outside in the area. The prosecutor argued that those factors were sufficient to justify a *Terry* stop and frisk for weapons. Second, the prosecutor responded that when Officer Anderson felt the "deck," it was immediately clear to him that the item contained cocaine.

The court did not rule at the conclusion of the hearing. Later that day, it issued a brief order denying the motion to suppress. On August 23, 2004, following a joint request by the parties, it issued a written memorandum opinion explaining its ruling.

The court recounted all of the descriptions of the robbery suspects broadcast to the police officers. It assessed whether there was reasonable suspicion based on the totality of the circumstances, as known to the officers. It found that the officers had reasonable suspicion to stop the appellant and Dargon because: there were two of them; they were African–American men; both were wearing dark clothing; they were detained within 9 to 10 minutes after the initial robbery

report; they were found in a dimly lit area at night; and their height was within 1–2 inches of that given in the initial broadcast description. The court further found that the presence of the two men in close proximity to the crime scene, walking near a trail the dispatcher had reported that the two suspects were seen running on, in an amount of time that it would have taken the suspects to traverse the trails, served to bolster the officers' reasonable suspicion. The court noted that the corroborating circumstances "sufficiently narrowed the class of persons who could legitimately be stopped." *See Stokes v. State*, 362 Md. 407, 765 A.2d 612 (2001).

Second, the court ruled that the frisk and seizure of cocaine from the appellant's jacket pocket did not violate the Fourth Amendment. Because the two men were suspected of having committed an armed robbery, there was reasonable suspicion that they were armed, thus justifying a search for the officers' safety. Further, the court found that, during the frisk of the appellant, Officer Anderson felt evidence of contraband that to him was immediately apparent and plainly known to the touch. The court concluded that all evidence seized during the stop and frisk was admissible under the Fourth Amendment.

The appellant was convicted and sentenced as stated above. He then filed a timely notice of appeal.

We will include additional facts as necessary to our discussion.

## DISCUSSION

The appellant contends the motion court erred in denying his motion to suppress because: 1) the stop was not based on reasonable articulable suspicion that he had just committed the armed robbery (or any crime); 2) the police were required to direct questions designed to dispel any suspicion prior to frisking him, but did not do so; and 3) the frisk exceeded the permissible scope of a *Terry* frisk. We shall address each of these issues separately.

 In reviewing a circuit court's ruling on a motion to suppress evidence, we consider only the evidence adduced at the suppression hearing; we do not consider the trial record. *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000)); *Nero v. State,* 144 Md.App. 333, 341–42, 798 A.2d 5 (2002) (citing *Rowe v. State,* 363 Md. 424, 431, 769 A.2d 879 (2001)). The standard of review is well-settled:

> "In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing, extend deference to the fact finding of the suppression judge, and accept those findings as to disputed issues of fact unless clearly erroneous. See *Jones v. State,* 343 Md. 448, 457–58, 682 A.2d 248 (1996); *Pryor v. State,* 122 Md.App. 671, 677 n. 4, 716 A.2d 338 (1998); *Partee v. State,* 121 Md.App. 237, 244, 708 A.2d 1113 (1998). We also consider those facts that are most favorable to the State as the prevailing party on the motion. *Jones, [supra,]* 343 Md. at 458, 682 A.2d 248; *Partee, [supra,]* 121 Md.App. at 244, 708 A.2d 1113. We make our own independent constitutional appraisal based on a review of the law as it applies to the facts of the case. *Jones, [supra,]* 343 Md. at 457, 682 A.2d 248."

*Nero, supra,* 144 Md.App. at 342, 798 A.2d 5 (quoting *Brown v. State,* 124 Md.App. 183, 187–88, 720 A.2d 1270 (1998)).

(i)

 The appellant argues that there was not reasonable suspicion to support a *Terry* stop because he and Dargon were engaged in wholly innocent activity; they "bore little resemblance to the slightly built teenagers who perpetrated the robbery"; they did not flee, but instead walked directly toward the police officers; and they were stopped in a predominantly African–American neighborhood, so the fact that they matched the dispatcher's description of the suspects in that they are black was meaningless.

The State responds that there was reasonable suspicion to support a *Terry* stop because the description of the armed robbery suspects was sufficiently particular with regard to race, gender, size, age, and clothing; the appellant and Dar-

gon were a close enough match to that description; the appellant and Dargon were stopped within 13 minutes of the initial crime report, in the general area within which the crime occurred; there were no other people in that area; and the two men were headed in the same direction as the armed robbery suspects.

 A brief investigatory stop by a police officer meets the reasonableness requirement of the Fourth Amendment when it is based upon reasonable, articulable suspicion that a crime is being committed, has been committed, or is about to be committed by the individual stopped. *Terry, supra*, at 30, 88 S.Ct. 1868. The reasonable, articulable suspicion standard is less than probable cause but more than a mere hunch. Whether the standard has been met must be decided on a case-by-case basis, viewing the "totality of the circumstances." *U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

 In deciding whether there was reasonable, articulable suspicion to support a *Terry* stop, this Court ordinarily takes into account the factors articulated in 4 Wayne R. LaFave, *Search & Seizure* § 9.5(g), at 550–51 (4th ed.2004), and approved by the Court of Appeals in *Stokes v. State, supra*, 362 Md. 407, 765 A.2d 612, and *Cartnail v. State, supra*, 359 Md. 272, 753 A.2d 519. They are:

(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

To satisfy the reasonable suspicion standard, the above factors, considered together, "must serve to eliminate a substantial portion of innocent travelers." *Cartnail, supra*, 359 Md. at 291, 753 A.2d 519 (citations and quotations omitted).

In *Stokes, supra,* the Court of Appeals applied the above factors to the totality of the circumstances in the case and concluded that the *Terry* stop of the defendant was not supported by reasonable, articulable suspicion of criminal activity. There, the police broadcast a description of an armed robbery suspect that did not give his height and weight or describe his getaway vehicle. It simply described the suspect as a black male wearing a black T-shirt. Thirty minutes after the broadcast went out, the defendant, a black male, sped into a parking lot around the corner from the crime scene and came to a stop. He was wearing dark clothing. A police officer parked in the lot stopped him and patted him down, uncovering marijuana.

The Court concluded that, "[v]iewing the totality of the circumstances, the stop in this case was based on nothing more substantial than a hunch...." *Id.* at 413, 765 A.2d 612. It characterized the broadcast description as "sparse at best," and found that it did not "sufficiently narrow the class of persons who could legitimately be stopped." *Id.* at 425, 765 A.2d 612. It observed that one would expect a robber in a vehicle to have proceeded beyond the neighborhood of the crime in 30 minutes and that it was not significant that the defendant was the only person in the parking lot, because it was 10:00 p.m., and the lot was in a residential neighborhood. The Court noted, additionally, that the State did not present any evidence that the presence of a black man in that neighborhood was unusual. The Court pointed out that the fact that the defendant parked his car near a marked police car and did not appear startled by the police presence militated against reasonable suspicion that he was the robber. Ultimately, the Court concluded that the stop was based merely on the defendant's race and clothing description.

In *Cartnail, supra,* decided one year before *Stokes,* the Court likewise held that there was not reasonable, articulable suspicion of criminal activity to support a *Terry* stop. In that case, workers at a Quality Inn Hotel were robbed at approximately 1:49 a.m. The police obtained information from anonymous sources that three black males fled the scene in a gold

or tan Mazda. Over an hour later, about two miles from the crime scene, an officer spotted the defendant, a black male, driving a gold Nissan, in which there was one passenger, also a black male. The officer stopped the Nissan. The officer discovered that the defendant was driving with a revoked license and arrested him for that reason.

The Court of Appeals held that the stop was not supported by reasonable, articulable suspicion that the defendant had committed the hotel robbery. Noting that the only matching factors in the description were gender, race, and the color of the car, the Court found a "lack of corroboration between the description of the robbery suspects and the circumstances surrounding [the defendant] at the time of the stop." *Id.* at 290, 753 A.2d 519.

The Court observed that the size of the area of possible flight after an hour was "relatively enormous" and the description as broadcast would have given the police "unfettered discretion to pull over seemingly infinite combinations of drivers." *Id.* at 294–95, 753 A.2d 519. In " 'a universe made up of all persons within fleeing distance of the crime in question . . . the characteristics of that group must be taken into account.' " *Id.* at 293, 753 A.2d 519 (quoting 4 Wayne R. LaFave, *Search & Seizure* § 9.4(g), at 199 (3d ed. 1996 & 2000 Supp.)). The Court concluded that reasonable suspicion did not exist, noting that "it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.' " *Id.* at 294, 753 A.2d 519 (quoting *U.S. v. Wood,* 106 F.3d 942, 948 (10th Cir.1997)).

By contrast, in *Collins v. State,* 376 Md. 359, 829 A.2d 992 (2003), the Court held that a *Terry* stop was supported by reasonable suspicion that the defendant had committed an armed robbery. In that case, the broadcast described the suspect as a black male; 5'8"; 160 lbs; and wearing a black "nubbie" hat and a long-sleeved gray shirt or sweatshirt with a black stripe or stripes; and stated that he had fled on foot. About 8 to 12 minutes later, an officer saw the defendant in a

Burger King parking lot, about 200 yards from the crime scene. The defendant was 6′; 180 lbs.; and was wearing a black coat, gray sweatshirt, and a black "nubbie." When the defendant saw the marked patrol car enter the parking lot, he quickly turned to walk toward a payphone, as if he were going to make a call. The defendant fled during the officer's field interview with him.

After noting "that descriptions by victims may be imprecise as to height and weight and that robbers often shed or change their clothes to foil detection," *id.* at 370, 829 A.2d 992, the Court opined that the important issue in reasonable suspicion cases is the strength of those factors that do match.

The Court distinguished *Stokes* and *Cartnail,* as they involved very general descriptions of clothing and did not include height, weight, or method of escape. In *Collins,* such characteristics were described and the defendant matched many of them: he was an African–American male wearing a "nubbie" and gray and black clothing. The Court noted that a disparity in weight would not be unusual given that it was winter and the defendant was wearing winter clothing. The Court last noted that the range of flight for the robber was limited, and that the defendant was spotted on foot in close proximity to the crime scene soon after the crime occurred. Additionally, the defendant acted suspiciously upon seeing the police officer.

In *Craig v. State,* 148 Md.App. 670, 814 A.2d 41 (2002), this Court considered the issue of reasonable suspicion based upon the description of a felony theft suspect. In that case, the suspect was described as a black male; 5′4″; wearing a blue baseball cap and a black or blue shirt with white writing on it; in his twenties; and carrying a black bag. We noted that the defendant matched the particularized description given; he was stopped within minutes of the broadcast; the area in which the suspect was located was limited to one building where there were few other people; and the defendant reacted with suspicion upon seeing the police. On those facts, we held that the *Terry* stop of the defendant was based upon

reasonable suspicion that he had committed the theft in question.

In the case at bar, considering the relevant factors in light of the totality of the circumstances, we hold that the *Terry* stop of the appellant by Officer Anderson was based upon reasonable, articulable suspicion that the appellant had committed the armed robbery on Mountbatten Court.

## 1. The particularity of the description of the offender or the vehicle in which he fled.

The record in this case shows that the officers' knowledge of the description of the armed robbery suspects was based upon the broadcasts made before 9:34 p.m. Officer Anderson testified that the appellant and Dargon "were actually stopped and detained prior to that last [9:34 p.m.] description being given out." He also testified that Officer Rock "called out" with the suspects at 9:34 p.m., further supporting the conclusion that the appellant and Dargon were detained (and frisked) before the 9:34 p.m. broadcast description. The motion court, in its written memorandum, found that the appellant and Dargon were detained within 9 to 10 minutes of the dispatcher's first broadcast at 9:21 p.m, meaning by 9:31 p.m., at the latest. We accept the motion court's finding of fact on that issue, as it is based upon competent testimony adduced at the suppression hearing and is not clearly erroneous.

In the case at bar, similar to *Collins, supra,* and *Craig, supra,* the description of the suspects was particular. The dispatcher described the robbers as two black males; teenagers; 5'11"; wearing all black clothing. The dispatcher then stated that one suspect was wearing a long, black coat and that both suspects were seen running along the trail behind the Duke of Windsor apartment complex.

The appellant and Dargon are African–American males whose heights are within one to two inches of the height descriptions that were given; the appellant is 6'1" and Dargon is 5'10". In Officer Anderson's opinion, Dargon looked like a teenager. Both men were wearing dark clothing: the appel-

lant was wearing a green, military-style jacket, which could have been mistaken for black at night; and Dargon was wearing a black sweatshirt.

In addition, the location where the men were spotted was consistent with the broadcast description that the robbers were seen running on a trail behind the Duke of Windsor apartment complex. As explained above, that trail led to Windsor Mill Boulevard and to another trail across that road that ended at Richglen Court. Officer Anderson testified that he was familiar with the trails and that he and his colleagues decided to drive to Richglen Court because it was the ending point of the trail the robbers likely had taken, based on what the dispatcher had broadcast. Thus, the evidence showed that the appellant and Dargon were spotted by the police at the place the robbers would be expected to be, given the description of the trail they had taken. *Cf. Williams v. State*, 19 Md.App. 204, 310 A.2d 593 (1973) (stop of vehicle was reasonable when vehicle described in police broadcast was spotted by officer posted in area vehicle was likely to traverse in leaving crime scene and vehicle matched description of that given in broadcast).

## 2. The size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred.

The crime occurred at approximately 9:15 p.m.; the alert was initially broadcast at 9:21 p.m.; and the appellant and Dargon were stopped at approximately 9:31 p.m. Given that the suspects fled on foot, the broadcast descriptions indicated the suspects' direction and location of flight, and the appellant and Dargon were stopped 16 minutes after the crime occurred, the size of the area where the offenders could be found was relatively small.

## 3. The number of persons about in that area.

Officer Anderson testified that the officers patrolled the Richglen Court area until they came upon the appellant and Dargon. He also testified that it is a residential neighborhood

and that it would not be unusual for people to be outside at 9:30 p.m. He never suggested, however, that there were any people other than the appellant and Dargon outside on the night in question.

### 4. The known or probable direction of the offender's flight.

As discussed above, Officer Anderson knew that the armed robbery suspects had fled on foot and were seen running along the trail behind the Duke of Windsor apartment complex, which leads to a trail that empties into the location where the appellant and Dargon were spotted.

### 5. Observed activity by the person stopped.

Officer Anderson testified that the appellant and Dargon were cooperative, but also were "startled" upon seeing the police.

### 6. Knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

Officer Anderson testified that he was not aware of any past criminal conduct by the appellant or Dargon.

Accordingly, for the reasons explained, we agree with the motion court that Officer Anderson's stop of the appellant was based upon reasonable, articulable suspicion that the appellant and Dargon had committed the armed robbery on Mountbatten Court.

### (ii)

■ The appellant next maintains that the motion court erred in rejecting his argument that, prior to frisking him, the officers were required to ask him questions to dispel their suspicion that he was one of the armed robbers. Specifically, the appellant claims that the officers' failure to ask his name and for an explanation of his whereabouts rendered the subsequent frisk unconstitutional. He asserts that his responses to

such questions, had they been asked, would have dispelled any suspicion that he was one of the robbers.

The State responds that the motion court did not err in finding that the officers were not required to ask questions of the appellant prior to conducting the frisk. It argues that such a requirement would be directly at odds with the purpose of a *Terry* frisk, which is officer safety.

The appellant bases his argument primarily upon section CL section 4–206. That statute provides:

(a) *Limited search.*—(1) A law enforcement officer may make an inquiry and conduct a limited search of a person under paragraph (2) of this subsection if the officer, in light of the officer's observations, information, and experience, reasonably believes that:

(i) the person may be wearing, carrying, or transporting a handgun in violation of § 4–203 of this subtitle;

(ii) because the person possesses a handgun, the person is or presently may be dangerous to the officer or to others;

(iii) under the circumstances, it is impracticable to obtain a search warrant; and

(iv) to protect the officer or others, swift measures are necessary to discover whether the person is wearing, carrying, or transporting a handgun.

(2) If the circumstances specified under paragraph (1) of this subsection exist, a law enforcement officer:

(i) may approach the person and announce the officer's status as a law enforcement officer;

(ii) may request the name and address of the person;

(iii) if the person is in a vehicle, may request the person's license to operate the vehicle and the registration of the vehicle;

(iv) may ask any question and request any explanation that may be reasonably calculated to determine whether the person is unlawfully wearing, carrying, or transporting a handgun in violation of § 4–203 of this subtitle; and

(v) if the person does not offer an explanation that dispels the officer's reasonable beliefs described in paragraph (1) of this subsection, may conduct a search of the person limited to a patting or frisking of the person's clothing in search of a handgun.

(3) A law enforcement officer acting under this subsection shall take into account all circumstances of the occasion, including the age, appearance, physical condition, manner, and gender of the person approached.

(b) *Seizure of handgun and arrest.*—(1) If the officer discovers that the person is wearing, carrying, or transporting a handgun, the officer may demand evidence from the person of the person's authority to wear, carry, or transport the handgun in accordance with § 4–203(b) of this article.

(2) If the person does not produce the evidence specified in paragraph (1) of this subsection, the officer may seize the handgun and arrest the person.

(c) *Written report.*—(1) A law enforcement officer who conducts a search or seizure in accordance with this section shall file a written report with the law enforcement officer's employer unit within 24 hours after the search or seizure.

(2) The report shall be on a form that the Secretary of Public Safety and Correctional Services prescribes, shall include the name of the person searched, and shall describe the circumstances surrounding and the reasons for the search or seizure.

(3) A copy of the report shall be sent to the Secretary of the State Police.

(d) *Civil actions.*—On request of a law enforcement officer, the Attorney General shall defend the officer in a civil action, including any appeal, in which the officer is sued for conducting a search or seizure under this section that is alleged to be unreasonable and unlawful.

(e) *Construction of section.*—(1) This section may not be construed to limit the right of a law enforcement officer to conduct any other type of search or seizure or make an arrest that is otherwise authorized by law.

(2) The provisions of this section are in addition to and not limited by the provisions of Title 2 of the Criminal Procedure Article. (An.Code 1957, art. 27, § 36D; 2002, ch. 26, § 2.)

At the outset, we note that the appellant did not preserve this issue for appellate review because he did not raise it below. *See* Md. Rule 8–131(a). The issue lacks merit in any event. .

In *Allen v. State,* 85 Md.App. 657, 584 A.2d 1279 (1991), this Court held that the statutory language that appears in CL section 4–206 does not serve as a basis for the suppression of evidence.[4] We further held that the statutory language is of "no Fourth Amendment significance," and that an officer's frisk of a person that is justified by reasonable suspicion that the person is armed and dangerous is unaffected by his failure to comply with the statutory language now set forth in CL section 4–206(a)(2). *Id.* at 673, 584 A.2d 1279.

In addition, we agree with the State that the appellant's argument is inconsistent with the purpose of the *Terry* frisk, which is to allow a police officer to perform a limited search for officer safety, following the stop of an individual based upon reasonable suspicion that he has committed a crime, if the officer also has reasonable suspicion that the person stopped is armed and dangerous. The cases cited by the appellant are inapposite. No court has ever required that a police officer first engage in conversation with an individual believed to be armed and dangerous before conducting a frisk. *Terry* allows a police officer to perform a frisk for his own safety, and for the safety of others in the vicinity, before asking questions that might confirm or dispel his initial suspicion.

Here, the appellant was stopped based upon Officer Anderson's reasonable suspicion that the appellant had just

---

4. The Court was analyzing the language of Article 27, section 36D, the predecessor to CL section 4–206, which is not substantively different than CL section 4–206.

committed an armed robbery. Officer Anderson was justified in frisking the appellant based upon his reasonable suspicion that the appellant was armed and dangerous. Officer Anderson was not required to ask questions of the appellant prior to frisking him.

### (iii)

 Finally, the appellant asserts that the seizure of the cocaine in his pocket was unconstitutional because it was the product of a search that exceeded the lawful bounds of a *Terry* frisk. Specifically, he argues that Officer Anderson employed a constitutionally impermissible "groping technique" that led to the discovery of the cocaine.

The State responds that the search did not exceed the scope of a permissible *Terry* frisk. It maintains that the motion court made findings that in the course of a reasonable search for weapons Officer Anderson felt an object that he immediately recognized to be illegal contraband. Under the "plain feel doctrine," as recognized by the Supreme Court in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), when that happened, Officer Anderson was permitted to seize the contraband.

In *Dickerson*, a police officer observed conduct by the defendant that raised a reasonable suspicion that he was engaging in illegal drug selling. The officer stopped the defendant and performed a patdown search. "The search revealed no weapons, but the officer ... did take an interest in a small lump in [the defendant's] nylon jacket." *Id.* at 369, 113 S.Ct. 2130. The officer felt the lump in the defendant's front pocket and examined it by squeezing it, sliding it, and manipulating it. The officer determined it was contraband (crack cocaine) only after performing these manipulations on a pocket he "already knew contained no weapon." *Id.* at 378, 113 S.Ct. 2130.

The Court held that if, in the course of conducting a lawful *Terry* frisk for weapons, a police officer feels something that he immediately recognizes, by the sense of touch, to be

contraband, he may seize it. In that circumstance, the intrusion caused by the search is no greater than it would have been anyway, because the scope of the search remains what is permissible to discover weapons:

> The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point. The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment. The same can be said of tactile discoveries of contraband. If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* at 375–76, 113 S.Ct. 2130 (citations and footnote omitted).

In applying its holding to the facts of the case, the Court cautioned that application of the plain feel doctrine in the context of a *Terry* frisk does not open the door for general evidentiary searches. The scope of a search that results in the seizure of an item different from the one being searched for must not exceed the purpose of the search to begin with— in the case of a *Terry* frisk, a search for weapons. The Court concluded that the officer's search of the defendant's pocket exceeded the bounds of a proper *Terry* frisk because it was a "continued exploration of [the] ... pocket after [the police officer] concluded that it contained no weapon" and therefore was unrelated to the sole justification for the *Terry* search,

which was the protection of the police officers and others nearby. *Id.* at 378, 113 S.Ct. 2130.

*Dickerson* does not stand for the proposition, as the appellant suggests, that any frisk that involves "groping" exceeds the bounds of a permitted *Terry* frisk. It stands for the proposition that the scope of a *Terry* frisk is strictly circumscribed to a search for weapons and that contraband found by "plain feel" in the course of such a search may be seized.

In this case, unlike the officer in *Dickerson*, Officer Anderson had not already determined that the appellant's pocket was free from weapons when he felt the "decks" of cocaine. Also, unlike the officer in *Dickerson*, Officer Anderson immediately recognized the "decks" as contraband, upon feeling them.

The question here, then, is whether the grabbing, crumbling, and rolling hand movements that Officer Anderson used when he was searching the appellant's clothing for weapons exceeded the permissible scope of a *Terry* search because they went beyond what was necessary to determine if he was armed; and therefore everything detected by the search— including contraband plainly recognized as such by feel— should be excluded from evidence. *See Sibron v. New York*, 392 U.S. 40, 65–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (holding that, if a patdown goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* ).

■■■ We answer that question in the negative. Although a *Terry* frisk must be limited to what is needed to determine whether a suspect is armed, the reasonable scope of a patdown "must be assessed on a case-by-case basis," taking into account the surrounding circumstances. *State v. Smith*, 345 Md. 460, 467–68, 693 A.2d 749 (1997) (observing that search of a suspect's pockets was reasonable following a patdown given that he was wearing a winter coat) (citing *State v. Vasquez*, 167 Ariz. 352, 807 P.2d 520 (1991)). Given the surrounding circumstances in this case—that the patdown was of the outside of the appellant's winter coat—the touching technique .

described by Officer Anderson cannot be said to have been beyond what was necessary for him to learn whether the appellant was carrying a weapon in his pocket. From Officer Anderson's testimony, accepted by the motion court, he was performing a careful patdown search for weapons, using a technique that was standard in his police department, and had not ruled out the presence of a weapon in the appellant's pocket when he came upon the "decks" of cocaine, which he immediately recognized to be contraband.

Accordingly, we conclude that the *Terry* frisk of the appellant did not exceed the bounds of what is permissible constitutionally, and the suppression motion properly was denied.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**